OPINION OF THE COURT
George J. Pulver, Jr., J.
I. FACTUAL BACKGROUND
The children involved in this case are Corey (date of birth: May 22, 1995), Steven (date of birth: July 5, 1996), and John (date of birth: Jan. 31, 1998). Corey and Steven are biological brothers who were adjudicated neglected by their mother and father by this court’s orders entered May 8, 1998 and September 4, 1998, respectively. In December 1998, these two children were adjudicated permanently neglected by their mother and, in February 1999, were declared abandoned by their father. Accordingly, the rights of the biological parents of Corey and Steven were terminated and guardianship and custody rights were committed to the Commissioner of the Greene County Department of Social Services (hereinafter referred to as DSS).
John is the younger biological brother of three children (Debbie, Shannon and Larry), the three of whom were adjudicated neglected by the persons legally responsible for them by this court’s order entered February 20, 1997. After placing Debbie, Shannon and Larry in the custody of DSS for a period of one year, and after failed attempts at reunification of the family, judicial surrenders of these three children were accepted by this court in late April 1999. This court takes judicial notice of the fact that Debbie, Shannon and Larry were thereafter adopted by the foster parents with whom they had previously been placed: the Harrisons.
However, during the time period when DSS was still attempting to reunite the family of Debbie, Shannon and Larry, John was born. This court ordered a removal of John from his parents pursuant to Family Court Act § 1027 (b). Thereafter, a full hearing pursuant to Family Court Act § 1028 was conducted, after which the court found that the return of John to his parents pending the determination of the abuse/neglect petition would present an imminent risk to John’s life and/or health; a motion for the court to reconsider this decision and order was rejected. By decision and order of this court entered October 5, 1998, John was adjudicated a neglected child and placed in the custody of DSS for a period of one year. In March *439 and April 1999, John’s father and mother, respectively, executed judicial surrenders of their parental rights and this court vested guardianship and custody rights of John with DSS.
A fourth sibling of John, a younger brother named Jerry, presently resides with his biological mother in Albany County under the supervision of the Albany DSS and other authorized agencies. Although Jerry was placed in petitioners’ foster home for a short time, he was later removed and returned to his biological mother. John has no contact with this sibling.
Petitioners Alicia Benson and Richard C. Benson met in early 1992 and have been happily married since September 1993. In November 1996, they bought a four-bedroom home located on approximately IV2 acres of land in anticipation of raising a family. Unable to conceive biological children, but desirous of having children in their lives, petitioners satisfied the rigorous requirements and became certified as adoptive foster parents[2] on October 14, 1997. That same day, DSS placed Corey and Steven in petitioners’ home. At that time, Corey was 28 months old and Steven was 15 months old. Thereafter, on March 6, 1998, DSS placed five-week-old John in petitioners’ home. Since the time of their placements, the three children have lived every day of their lives in petitioners’ home and under their care. The children, now ages 4V2, 3V2, and almost 2 years old, know each other as brothers and recognize petitioners as “mommy” and “daddy.” Petitioners now wish to legally formalize their familial situation by court-approved agency adoption of Corey, Steven, and John as their sons.[3]
II. THE CONSTITUTIONAL CHALLENGE
In February 1999, the Adoption and Safe Families Act (L 1999, ch 7 [hereinafter referred to as ASF A]) became effective. ASF A requires a court to deny all applications of prospective adoptive parents whose criminal history reveals a felony *440 conviction for, inter alia, a crime involving violence other than physical assault or battery (see, Social Services Law § 378-a [2] [e] [1]).[4] Furthermore, Social Services Law § 378-a (2) (h) mandates that, upon revelation of a conviction for any of the crimes set forth in Social Services Law § 378-a (2) (e) (1), the authorized agency must remove any foster children residing in the home of the foster parent or prospective adoptive parent.
Petitioners’ agency adoption applications are subject to the rules set forth in Social Services Law § 378-a (2) (e) (1) and (2) (h) because of Richard C. Benson’s June 1985 conviction of the violent felony of armed robbery. Therefore, in anticipation of this court’s denial of their agency adoption applications, and the mandated removal of the children from their foster home by DSS, petitioners filed against DSS for custody and temporary guardianship of the children. Such petition was granted by order of this court entered November 29, 1999 and is presently in effect. DSS immediately decertified petitioners as foster adoptive parents and closed its active files on petitioners and the three children. Thereafter, petitioners requested a plenary hearing and sought court rulings: (1) that the irrebuttable presumption of Social Services Law § 378-a (2) (e) (1) (A) violates both State and Federal constitutional due process requirements; (2) vacating the order granting temporary guardianship and custody of the children to petitioners and re-vesting guardianship and custody in DSS; (3) restoring petitioners to their status as certified foster adoptive parents retroactive to December 6, 1999 and ordering payment of subsidies retroactive to such date; and (4) approving petitioners’ applications for the agency adoptions of the three minor children with the first names Corey, Steven and John.
III. THE PLENARY HEARING
After reviewing the submitted papers, and hearing oral argument on the matter, the court scheduled the requested plenary hearing for December 17, 1999. On such date, the hearing *441 ensued with Joseph Stanzione, Esq., of Lewis & Stanzione representing the petitioners, James C. Steenbergh, Esq., representing the Greene County Department of Social Services, and Robin DePuy-Shanley, Esq., appearing as Law Guardian for the three children whose first names are Corey, Steven and John. The Office of the Attorney General, although on notice of the constitutional challenge to ASPA (see, CPLR 1012 [b]), declined to intervene at this time.
Petitioner Richard C. Benson is a 36-year-old husband and foster father who has been either gainfully employed or in school since his release from prison in December 1989; his criminal history was fully disclosed when petitioners applied for certification as adoptive foster parents and was not viewed by DSS to be any reason to prevent placement of foster children in his home. The facts and circumstances of Richard’s felony conviction are as follows: in June 1985, at the age of 21, he was convicted in the State of New Jersey by a plea of guilty to the crime of armed robbery and was sentenced to a determinate sentence of four years’ State incarceration.
Admittedly engaged in a life of alcohol and drugs at the time, on the date in question Richard and one of his friends had approached a car driven by people that they knew. Poking his head in the car, Richard’s friend asked the occupants if they had any drugs. When they answered “no,” the friend brandished a knife after which he and Richard took certain drugs (i.e., “speed”) from the occupants of the car. During the incident, Richard possessed a knife but did not brandish the weapon. Although the specifics of how the police were led to him are unknown by Richard, he was eventually arrested for the crime and pleaded guilty.
While in prison, Richard did “a lot of soul searching,” decided that “this wasn’t the life [he] wanted” and “decided to make changes.” He attended Alcoholics Anonymous classes, Narcotics Anonymous classes, availed himself of mental health services, completed college courses, and worked. In December 1989, due to his good behavior, Richard was released from prison almost one year early and immediately moved to New York. Since that time, he has been on parole under New York supervision with no reported problems. Richard’s parole officer, William Splain, writes that Richard “has made a very significant turn around in his lifestyle from one involved in larcenous, assaultive and alcohol related behavior to one of a homeowner, responsible parent and good husband” (petitioners’ trial exhibit 4). According to Splain, Richard’s “exemplary *442 adjustment over a long term suggest [s] his suitability for [parole] discharge consideration” but notes that New Jersey officials are the only ones who have the authority to initiate early termination of parole (id.). As it stands now, Richard is due to complete his parole supervision in early 2000.
Initially, Richard worked as a laborer in a lumber yard in Saugerties, New York, ultimately becoming the head sawyer in charge of personnel. This job was seasonal, however, and therefore Richard went to Columbia Greene Community College and participated in a BOCES program to obtain his degree in welding. Although this is a two-year program, Richard accelerated the program, thereby completing it in one year. Richard was recognized by one of his teachers as having special skills and was recommended, and hired, for the position of substitute teacher in welding, automotive, and construction. Such teacher also recommended Richard for a welding position at a company called W.B. McGuire where Richard first worked as a welder fabricator and, after only two years with the company, became fabrication shop supervisor of the second shift (supervising approximately 50 employees).
In August 1998, Richard took a position at St. Lawrence Cement in Catskill, New York, which afforded him more money, more stability, and hours which allow him to spend more time with the children. The General Manager and Human Resource Manager of St. Lawrence Cement relay that Richard is one of their best employees at the Catskill facility with no behavioral, attendance or interpersonal skill shortcomings. Deadlines are always met and the quality of his work is superb. He works well with others and gets along with peers, supervisors, and management. In fact, Richard is presently being considered for promotion to a supervisory level. Presently, Richard’s income supports the family since, when Corey and Steven were placed in their home, petitioners decided that Alicia should stay at home full time. It is clear to the court that Richard takes this role as the family breadwinner very seriously.
The psychological/social evaluation of Reinaldo Cardona, CSW-R, who has worked with the Benson family unit since Corey was placed in their home, was admitted into evidence. This evaluation notes that when his work schedule permitted, Richard participated in meetings to develop strategies for Corey’s inappropriate and destructive behaviors (i.e., banging his head, spitting at people, using foul language, and biting) which was the result of his having suffered abuse/neglect. Cardona has observed both petitioners appropriately discipline Corey *443 and notes that petitioners’ attitude and behavior in the community clearly reflect positive family values. Cardona also notes that “Corey has made tremendous progress while in this home” (petitioners’ trial exhibit 3) and gives his professional opinion, without reservation, that Richard has been completely rehabilitated and is a productive member of society working to support his family and affectionately caring for and playing with his children and serving as an excellent role model for the boys of how to be hard-working, gentle and caring human beings.
Behavior specialist and children’s mental health advocate Mary Magee Quinn, Ph D, who is also a member of Alicia’s extended family, notes that Corey and Steven lived with a number of families before being placed with petitioners, and that, at the time of their placement with petitioners, they had social, behavioral and language development delays; similarly, John was behind in his physical development at the time of his placement with petitioners. Dr. Quinn fears that, if removed from petitioners’ home, all of the children would not continue to grow and prosper as they have while with petitioners and would miss not only the love and care which petitioners give them, but also the love of an extended family network including a great-grandmother, great aunts and uncles, grandparents, and aunts and uncles.
Child psychologist David A. Nevin, Ph D, opines that the boys are bonded to petitioners as their psychological parents and that removal of the boys from petitioners’ home will damage the boys and destroy the parental bonding which has developed. Holly L. Pavlin, PHN, infant child health assessment program coordinator for Greene County Public Health Nursing Service who was involved with petitioners since July 1998, notes that the children “had obviously been stimulated positively, and played with, read to, and encouraged to use language skills [by petitioners]” (petitioners’ trial exhibit 7).
Sheron Regan, Greene County DSS Supervisor of Child Protective Services, testified that it was her professional opinion, based on her 29 years of work experience at DSS, that it is in the children’s best interests to remain in petitioners’ home and to be adopted by petitioners. Ms. Regan, who is also a neighbor of petitioners but did not know them until they applied to become foster parents, testified that Corey and Steven have shown a marked improvement since being placed in petitioners’ home. For example, Corey was thought to be hyperactive and had temper tantrums; upon Alicia’s reporting *444 to the pediatrician that he “shakes” up to 10 times a day he was diagnosed with epilepsy and is now stabilized with medication. According to Ms. Regan, the children are very bonded to petitioners and it would be “extremely traumatic” for the children if they were removed from petitioners’ home.
Particularly poignant was Alicia’s answer to the Law Guardian’s inquiry as to whether the boys have exhibited any concern about being removed from the home. Alicia testified that, when John’s brother Jerry was taken out of placement in the Benson home and given back to his biological mother, Corey wanted to know why petitioners had “gotten rid of him,” asking Alicia “was it because he was bad or cried too much?” When Corey, Steven, and John were freed for adoption, and before petitioners learned of ASFA and its potential implications for them, they told the children “over and over again” that they would always be their mommy and daddy no matter if the children misbehaved, etc.
DSS Caseworker Erica Valenti was involved in the attempted reunification of John with his biological parents and, hence, from the period of March 1998 through March 1999 had interaction with petitioners on an almost daily basis. According to her, Corey, Steven and John “know that they’re safe” with petitioners. Ms. Valenti’s SVa-month-old son is cared for by Alicia Monday through Friday while Ms. Valenti is working. Testifying that she “sees a lot in this job,” Valenti noted that she felt 100% better when Alicia and Richard said that they would provide child care for her son.
With full knowledge of Richard’s criminal conviction, DSS certified petitioners as adoptive foster parents and has had no problems; indeed, petitioners were recognized with a certificate of appreciation for their outstanding service as foster parents signed by the Director of Social Services and the Commissioner of Social Services.
According to Richard C. Benson, the difference between him at age 21 when he committed his crime and him now is “night and day.” He regrets very much what he did and who he hurt. He has been a sober alcoholic for 10 years and has not used any controlled substances since his felony conviction. He reads to the children, takes Corey and Steven to karate lessons, and includes the boys in whatever he is doing around the house whether it is raking leaves or changing the oil in his car. He takes the children to medical appointments, on one occasion holding Corey on his lap for two hours while tests were performed to diagnose/treat his epilepsy. In all respects, he considers the children to be his sons.
*445 Law Guardian Robin DePuy-Shanley, Esq. “wholeheartedly” supports the proposed adoptions as being in the children’s best interests, testifying that she has had contact with petitioners since John was placed with them and as recently as March 1999.[5] She notes the remarkable fact that petitioners have forged a bond with the Harrisons in order to allow John to develop relationships with three of his biological siblings: Debbie, Shannon, and Larry (for whom Shanley has always been the Law Guardian). Observing a joint visit between petitioners and the Harrisons, amassing seven children under the age of six, Shanley testified regarding the happy, congenial atmosphere wherein everyone’s needs were provided for. She described Corey and Steven climbing on Richard without any inhibitions and stated: “They’re a family. They’re completely comfortable. It’s clear they love them.”
In addition to all of the aforementioned testimony adduced, this court has a unique perspective on this case due to its involvement in all of the cases of Corey, Steven, and John, as well as John’s biological siblings Debbie, Shannon, and Larry who were eventually adopted by the Harrisons. This court knows full well from whence Corey, Steven and John came and how lucky they are to have found stability and unconditional love in petitioners’ home. Particularly remarkable are petitioners’ selfless efforts to allow John contact with his biological siblings Debbie, Shannon, and Larry whom Corey and Steven know as their “cousins.” This sibling visitation was facilitated, and indeed initiated, by foster parents who truly understand what is best for a child and are willing to do what it takes to obtain that regardless of the hard work. These are the actions of parents.
It is absolutely clear to this court that Richard has fully rehabilitated himself from his long-ago life of crime and is a positive role model for Corey, Steven, and John, all of whom view him as “daddy.” It is equally clear that petitioners are the best thing that ever happened to Corey, Steven, and John and that it is in the children’s best interests to become petitioners’ legal sons through adoption.
IV. CONSTITUTIONAL ANALYSIS
This court finds that Corey, Steven, and John have a constitutionally protected right, as foster children, to proce *446 dural due process which protects them from arbitrary State decisions which significantly impact their custody and welfare (see, Matter of Jonee, 181 Misc 2d 822, 828) and which could indiscriminately force them to lose yet another family relationship (see, supra, at 828, citing Moore v City of E. Cleveland, 431 US 494; Sinhogar v Parry, 53 NY2d 424). Application" of the irrebuttable presumption delineated in Social Services Law § 378-a (2) (e) (1) in this case would require this court to deny petitioners’ agency adoption petitions and DSS to remove the three children from petitioners’ home (see, Social Services Law § 378-a [2] [h]). This would deprive the three boys of the only loving family relationship which they have been raised in throughout their young lives.
It is this court’s finding that the irrebuttable, per se statutory presumption that: (1) petitioners are unfit to raise Corey, Steven, and John, and (2) it is in these children’s best interests to be removed from the only stable home that they have ever known fails to satisfy State and Federal due process requirements and is therefore declared and found to be unconstitutional. The way that ASFA has been enacted prevents any person from ever attempting to rebut the previously mentioned presumptions; this is what renders the statutory provision unconstitutional.
All of the evidence in this case demonstrates that Corey, Steven, and John have thrived under petitioners’ care, that petitioners have exceptional parenting skills, and that the five view themselves," and others view them, as a family unit. Richard’s felony conviction is far removed in time and, indeed, Richard is a successfully rehabilitated person who is a productive, law-abiding member of society.
There is no overriding State interest for establishing and enforcing an ASFA procedure which would result in an outcome that is contrary to the best interest of Corey, Steven, and John (see, Matter of Jonee, supra, at 828). Surely these three children are entitled to their day in court — to an individualized hearing where evidence could be adduced before a court which would then render its determination as to whether the proposed adoption is in the children’s best interest. To rule otherwise is to make a felony conviction the dispositive factor in all proposed adoptions regardless of whether the proposed adoption is in the child’s best interest. The case may be rare when it is in the child’s best interest for such a proposed adoption to be accepted by a court; however, allowing a court to make an individualized determination rather than dismissing *447 the adoption petition outright would better serve ASFA’s stated purpose of preserving the health and safety of children in foster care (see, supra, at 829, citing Governor’s Mem approving L 1999, ch 7, 1999 McKinney’s Session Laws of NY, at 1467). Certainly, a case-by-case court determination would satisfy due process (see, Matter of Jonee, supra, at 829, citing Cleveland Bd. of Educ. v LaFleur, 414 US 632, 643).
V. CONCLUSIONS OF LAW
Accordingly, after conducting an in camera review of the foster care and adoption files of the children and petitioners, and after considering all of the evidence adduced at the plenary hearing, and noting that the Greene County Department of Social Services as well as the children’s Law Guardian support the proposed adoptions by petitioners as in the children’s best interests, now, after having given consideration to all of the facts and circumstances in this matter, and noting this court’s particular knowledge of the children’s histories and how much they have benefitted from their placement in petitioners’ home, it is hereby ordered that Social Services Law § 378-a (2) (e) (1) (A) is declared unconstitutional, as violative of both Federal and State due process requirements for the reasons outlined above; and it is further ordered that, it being in the best interests of Corey, Steven, and John for petitioners’ adoption applications to be granted, the Chief Clerk of the Family Court is directed to calendar the petitions for finalization as soon as they are complete; and it is further ordered that, retroactive to December 6, 1999, petitioners be reinstated as certified adoptive foster parents entitled to both prospective and retroactive subsidies; and it is further ordered that the motion to vacate this court’s order which granted petitioners temporary legal guardianship and custody of Corey, Steven, and John is hereby granted and such order is hereby vacated; and it is further ordered that legal guardianship and custody of Corey, Steven, and John is hereby vested in DSS; and it is further ordered that placement of Corey, Steven, and John in petitioners’ home be continued until further order of this court; and it is further ordered that DSS shall make the necessary arrangements to retrieve the six files relative to this case which were previously produced for an in camera review.

. Adoptive foster parents are distinguishable from foster parents who are not certified to adopt. The latter type of foster parents provide foster care for children on a short-term basis; they may have 30 children come and go in one year. Persons who are eligible and willing to adopt foster children, however, may be certified by DSS as adoptive foster parents. These parents typically have children placed with them on a more long-term basis. If DSS is unable to achieve its primary goal of family reunification, its secondary goal is for the adoptive foster parents to adopt the children.

. The significance of the adoptions being “agency” adoptions is that two of the children, Corey and Steven, qualify as “special needs children” thereby entitling petitioners to a monthly stipend which they would not receive through a nonagency/private adoption.

. The relevant portion of ASFA provides that:
“Notwithstanding any other provision of law to the contrary, an application for certification or approval of a prospective foster parent or prospective adoptive parent shall be denied where a criminal history * * * reveals a conviction for:
“(A) a felony conviction at any time involving: (i) child abuse or neglect; (ii) spousal abuse; (iii) a crime against a child, including child pornography; or (iv) a crime involving violence, including rape, sexual assault, or homicide, other than a crime involving physical assault or battery.” (Social Services Law § 378-a [2] [e] [1].)

. Corey and Steven were represented by another Law Guardian in their neglect proceedings but, in the interest of consolidating matters, after John was placed in petitioners’ home Ms. Shanley was appointed as Law Guardian for all three children.