Filed 6/26/13; pub. order 7/18/13 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re H.K., a Person Coming Under the Juvenile Court Law. | B242800 |
| _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK49248) |
| Plaintiff and Respondent, | |
| v. | |
| H.K., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Debra Losnick, Juvenile Court Referee.  Affirmed.

Kimberly A. Knill, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Kimberly A. Roura, Associate County Counsel, for Plaintiff and Respondent.

H.K. appeals a post dispositional order denying her request to be placed with C.K., her adult half-sibling who lives in Arizona. The juvenile court denied the request because C.K. has a 1995 Oregon conviction of first degree manslaughter, which is equivalent to a conviction of voluntary manslaughter in California, and California law prohibits placement of a child in the home of any person, including a relative, who previously has been convicted, inter alia, of violent offenses including murder and voluntary manslaughter. (Welf. & Inst. Code, § 361.4; Health & Saf. Code, § 1522, subd. (g)(1)(A)(i); Pen. Code, § 667.5, subd. (c)(1).)

H.K. contends this prohibition is unconstitutional as it applies to her because it impermissibly interferes with her fundamental right to maintain family ties and does not permit exceptions in the juvenile court's discretion. Case law recognizes the right of a child to remain in a bonded placement, even with non-relatives, but does not establish a right to be placed with a relative with whom the child does not have such a relationship. Here, H.K. has met C.K. only a few times in her life and has never lived with him. We conclude H.K. does not have a fundamental right to be placed with C.K. and the restriction on the placement passes constitutional muster under the rational relationship test as it is logically related to the protection of children in foster care, which is a compelling state interest.

We therefore affirm the order under review.

## FACTS AND PROCEDURAL BACKGROUND

1. *Prior dependency case.*

In June of 2002, the Department of Children and Family Services (the Department) removed then two-year-old H.K. from father's custody after she was found wandering alone at a busy intersection. The juvenile court sustained a petition alleging father and mother have a history of substance abuse. H.K. was placed with maternal aunt and uncle but was returned to father's care and dependency jurisdiction terminated. Mother committed suicide in 2002.

2.  *The current case; detention; petition sustained.*

In March of 2010, father's girlfriend was arrested after a physical altercation with father and father agreed to participate in family maintenance services.

In August of 2010, the Department received a referral alleging father was abusing prescription drugs, frequently lost consciousness and drove while under the influence with H.K. in the car.  H.K. was detained and placed with maternal aunt and uncle. The Department reported H.K. was happy in her placement and maternal aunt stated she was willing to adopt if reunification efforts failed.

On October 20, 2010, the juvenile court sustained a dependency petition based on father's history of alcohol abuse, current abuse of prescription medication and domestic violence in the presence of the child.  The juvenile court granted father family reunification services and monitored visitation.

3. *Reunification efforts.*

For the six-month review hearing, the Department reported father had completed a substance abuse program but he tested positive for opiates in about half of his drug tests. Also, some of father's monitored visits had to be cancelled because father discussed the case with H.K. or arrived under the influence of drugs.

In May of 2011, the Department reported H.K. did not want unmonitored visits or conjoint therapy with father as he continued to use drugs.  H.K. told the social worker, "I want to stay with [maternal aunt] or my brother in Arizona."  H.K. reportedly was acting out and maternal aunt thought she slowly was getting out of control.

In August of 2011, the Department reported father had tested positive for Hydrocodone in 8 of 22 tests and had missed two tests.  H.K. refused to participate in conjoint counseling with father, accused father of physical abuse and stated she would "rather be dead than alive and living with [] father."

The Department noted maternal aunt had stated she wanted paternal relatives considered for placement of H.K. before she agreed to permanent placement of the child. On October 24, 2011, a social worker spoke with H.K.'s paternal half-sibling, C.K., who stated he was interested in caring for H.K.

On November 29, 2011, the juvenile court ordered the Department to initiate an Interstate Compact on the Placement of Children to investigate placement of H.K. with C.K. in Arizona.

Reports filed in February of 2012 indicated father continued to test positive for opiates. Also, a check of C.K.'s criminal history revealed a 1995 conviction in Oregon of felony first degree manslaughter with a firearm for which he was sentenced to "61 months [in] jail."

On February 7, 2012, the juvenile court terminated father's reunification services and ordered the Department to continue to evaluate the home of C.K., who appeared at the hearing.

4. *Evaluation of C.K.'s home*.

In May of 2012, the Department reported the Arizona social agency had approved C.K.'s home for placement of H.K. The Arizona home study indicated 36-year-old C.K. stated that, prior to the present case, he saw H.K. during holidays but these visits were "random." In May 2011, C.K. and his fiancée, Jennifer, met maternal aunt and H.K. for breakfast while they were visiting other relatives in Arizona. C.K. last saw H.K. in court in February of 2012. C.K. stated he had a good relationship with H.K. and he could give her time, attention and a stable home. He was committed to providing permanent placement but preferred legal guardianship unless father passed away.

C.K. reported he had worked as a mortgage broker and as a branch manager for a bank. He recently had been laid off from his job as an insurance adjuster and was receiving unemployment benefits. Jennifer has a college degree in education and works as a service manager at a bank. C.K. intended to start counseling services for H.K. and wanted to participate in her sessions.

C.K. indicated neither he nor Jennifer have any children or prior marriages. Between 1999 and 2003, C.K. lived with a girlfriend and her three children, ages 8 to 10 years. He was a father figure to the children and he maintains contact with all three. He also has taught martial arts to children and has been a mentor for the Big Brothers/Big Sisters program. C.K. and Jennifer lived in a clean, rented home with a pool in a housing development. H.K. would have her own room in the home.

C.K. reported he was in overall good health but has been prescribed Soma and Oxycodone for back pain. Regarding the Oregon conviction, C.K. stated that in 1994, when he was 18 years of age, he "accidentally" shot his friend, resulting in his friend's death. C.K. said he and his friend had been target shooting and C.K.'s gun discharged as C.K. placed the gun in the back window of his car so it would not violate concealed weapons laws. C.K. said the safety was on but failed. Against the advice of counsel, C.K. explained what happened to the police and thereafter pleaded guilty to "involuntary manslaughter." He was sentenced to five years in prison, paid $9,055 in restitution, was paroled in October 1998 and has had no further arrests. C.K. asserted he is in the process of setting aside the Oregon conviction. However, the Oregon court denied his first request on the ground the conviction was for a "Class A felony."

5. *Request for placement with C.K. denied.*

The Department reported the Arizona agency did not consider out-of-state criminal history when evaluating relative placements. However, the Department could not recommend placement with C.K. because his conviction of first degree manslaughter in the state of Oregon was equivalent to a voluntary manslaughter conviction in the state of California and, under California law, a conviction of voluntary manslaughter did not qualify for an exemption.

In June of 2012, the Department reported maternal aunt and uncle preferred not to proceed with legal guardianship until all available paternal relatives had been exhausted. Maternal aunt indicated H.K. likes to be the center of negative attention and remains angry about the loss of her mother. Maternal aunt believed paternal relatives, such as C.K.'s siblings, might be interested in providing H.K. a permanent home. Maternal aunt

stated if no other relatives were available, her husband might agree to legal guardianship. Maternal aunt indicated C.K. has only had three prior contacts with H.K. H.K. stated she liked living with maternal aunt but would rather reside with C.K.

On June 5, 2012, H.K. asked the juvenile court to grant her request to be placed in Arizona with C.K. The juvenile court indicated that, although it would like to place H.K. with C.K., it lacked discretion to do so. The juvenile court invited H.K. to appeal and expressed the hope the Legislature would change the law because the current system is "absolutely untenable. We cannot place children with relatives that they should be placed with. And, frankly, this may be one of those cases."

## CONTENTIONS

H.K. contends the prohibition on placement with C.K. interferes with her fundamental interest in maintaining family ties and violates federal and state substantive due process guarantees by failing to provide for an individualized determination of her best interests and precluding an individual convicted of voluntary manslaughter from ever becoming a foster parent.

## DISCUSSION

1. *The statutory framework.*

Welfare and Institutions Code section 361.3, subdivisions (a) and (c)(1) provide that when a child is removed from the physical custody of a parent, a relative's request for placement shall be given preferential consideration. When a child is to be placed with a relative, extended family member or any person (other than his or her noncustodial parent) who is not a licensed or certified foster parent, Welfare and Institutions Code section 361.4 requires a criminal records check of the applicant. (See Welf. & Inst. Code, § 361.4, subds. (b), (c).) "If the criminal records check indicates that the person has been convicted of a crime that [would preclude licensure as a foster home] under section 1522 of the Health and Safety Code [that is, any crime other than a minor traffic violation], the child may not be placed in the home unless a criminal records exemption has been granted by the county, based on substantial and convincing evidence to support a reasonable belief that the person with the criminal conviction is of such good character as

to justify the placement and not present a risk of harm to the child . . . ." (Welf. & Inst. Code, § 361.4, subd. (d)(2).) "[I]n no event shall the county place a child in the home of a person who is ineligible for an exemption" under Health and Safety Code section 1522, subdivision (g)(1). (Welf. & Inst. Code, § 361.4, subd. (d)(3)(A).)

Health and Safety Code section 1522 provides that, with limited exceptions, an exemption shall not be granted pursuant to this subdivision if the conviction was for, inter alia, the crimes specified in Penal Code section 667.5, subdivision (c). (Health & Saf. Code § 1522, subd. (g)(1)(A)(i).) Penal Code section 667.5, subdivision (c)(1) lists "murder or voluntary manslaughter" as "violent felon[ies.]" (Pen. Code, § 667.5, subd. (c)(1).)[1] Health and Safety Code section 1522, subdivision (f)(2) provides: "[T]he department shall consider criminal convictions from another state or federal court as if the criminal offense was committed in this state."

The prohibition against placing a dependent child in a home where the child would have contact with an adult who has been convicted of a crime, other than a minor traffic violation, is mandatory. (*In re S.W.* (2005) 131 Cal.App.4th 838, 849; *Los Angeles County Dept. of Children & Fam. Services v. Superior Court* (2001) 87 Cal.App.4th 1161, 1166-1167; *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2005) 126 Cal.App.4th 144, 151.)

2. *The Oregon offense of first degree manslaughter qualifies as a violent felony in California.*

Under California law, murder is defined as an unlawful homicide with malice aforethought. (Pen. Code, § 187.) "[M]alice may be implied when a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life. [Citations.]" (*People v. Watson* (1981) 30 Cal.3d 290, 296.) Voluntary manslaughter is defined as a homicide "upon a sudden quarrel or heat of

---

[1]  An exemption available for individuals who have made a showing of rehabilitation for 10 years and have obtained the recommendation of the district attorney or an official certificate of rehabilitation does not apply "to foster care providers, including relative caregivers, . . . in those homes where the individual has been convicted of [murder or voluntary manslaughter]." (Health & Saf. Code, § 1522, subd. (g)(1)(A)(ii).)

passion." (Pen. Code, § 192, subd. (a).) Involuntary manslaughter is defined as manslaughter "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (Pen. Code, § 192, subd. (b).)

Under Oregon law, criminal homicide constitutes murder "[w]hen it is committed intentionally" and not "under the influence of an extreme emotional disturbance." (ORS § 163.115, subd. (1)(a).) "Criminal homicide constitutes first degree manslaughter when: [¶] (a) It is committed recklessly under circumstances manifesting extreme indifference to the value of human life;" or "(b) It is committed intentionally by a defendant under the influence of extreme emotional disturbance . . . ." (ORS § 163.118, subds. (1)(a) and (b).) Second degree manslaughter is defined as a criminal homicide "committed recklessly." (ORS § 163.125; subd. (1)(a).) Criminally negligent homicide is committed "when, with criminal negligence, the person causes the death of another person." (ORS § 163.145, subd. (1).)

The first definition of first degree manslaughter in Oregon, homicide committed when a defendant acts recklessly under circumstances manifesting extreme indifference to the value of human life, is the equivalent of second degree murder in California. (*People v. Watson*, *supra*, 30 Cal.3d at p. 295.) The alternate definition, homicide committed intentionally by a defendant under the influence of extreme emotional disturbance, constitutes heat of passion voluntary manslaughter in California.

Thus, first degree manslaughter in Oregon, at minimum, is the equivalent of voluntary manslaughter in California.

C.K.'s description of the circumstances of the Oregon offense to the Arizona social worker is suspect in that he admitted only negligence and claimed he was convicted of involuntary manslaughter. However, he pleaded guilty with the assistance of counsel to first degree manslaughter, the highest level of manslaughter in Oregon, which requires at least heat of passion. Thus, C.K.'s self-serving description of the facts surrounding the prior conviction appears to be inaccurate.

Further, C.K.'s attempt to expunge the conviction in Oregon is unlikely to succeed. Under Oregon law, first degree manslaughter is a Class A felony and no Class A felony can be expunged. (ORS §§ 163.118, subd. (3), 137.225, subd. (5).) In any event, an expunged conviction remains a disqualifying conviction under Welfare and Institutions Code section 361.4. (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2003) 112 Cal.App.4th 509, 518-519.)

3. *Relevant constitutional law principles*.

The due process clause protects substantive fundamental "liberty" interests against unreasonable government interference. (*Washington v. Glucksberg* (1997) 521 U.S. 702, 719-720 [138 L.Ed.2d 772].) In addressing a substantive due process argument, we first identify the liberty interest asserted and then determine whether it is a "fundamental right[] and libert[y [that is] objectively, 'deeply rooted in this Nation's history and tradition . . . .' " (*Id.* at pp. 720-721.) The United States Supreme Court has found fundamental liberty rights related to matters of marriage and procreation. (*Id.* at p. 720.)

When a statutory classification impinges on a "fundamental right," it is subject to strict scrutiny review. (*Reno v. Flores* (1993) 507 U.S. 292, 302 [123 L.Ed.2d 1]; *Plyler v. Doe* (1982) 457 U.S. 202, 216-217 [72 L.Ed.2d 786].) If a statute does not implicate a fundamental right or operate to the singular disadvantage of a suspect class, only a rational relationship to a legitimate state purpose is necessary to uphold the constitutional validity of the legislation. (*Washington v. Glucksberg*, *supra*, 521 U.S. at p. 728; *Niedle v. Workers' Comp. Appeals Bd.* (2001) 87 Cal.App.4th 283, 288-289; *Kubik v. Scripps College* (1981) 118 Cal.App.3d 544, 552.)

We address constitutional questions de novo. (*In re Allison J.* (2010) 190 Cal.App.4th 1106, 1112; *In re J.H.* (2007) 158 Cal.App.4th 174, 183.)

4. *The authority cited by H.K. does not give rise to a fundamental right to be placed with a sibling with whom she has no relationship other than biology.*

In asserting a fundamental right to be placed with a family member, H.K. relies on *Stanley v. Illinois* (1972) 405 U.S. 645 [31 L.Ed.2d 551] and three cases from the state of New York, *In re Adoption of Corey* (N.Y. Fam. Ct. 1999) 184 Misc.2d 437, 439

[707 N.Y.S.2d 767], *Matter of Abel* (N.Y. Fam. Ct. 2011) 33 Misc.3d 710 [931 N.Y.S.2d 829], *In re Adoption of Jonee* (N.Y. Fam. Ct. 1999) 181 Misc.2d 822, 824 [695 N.Y.S.2d 920]. However, these cases do not support her claim.

*Stanley v. Illinois* addressed a statute that presumed unmarried fathers unfit to parent their children. (*Stanley v. Illinois, supra,* 405 U.S. at pp. 649-650.) *Stanley* held the convenience of avoiding a hearing on an unmarried father's fitness "is insufficient to justify refusing a father a hearing when the issue at stake is the dismemberment of his family." (*Id.* at p. 658.) In contrast to the parental relationship at issue in *Stanley,* H.K. seeks to be placed with a half-sibling the child has rarely seen and who has been convicted of a serious crime causing death. Clearly, these are not equivalent relationships.

The New York cases cited by H.K. each involved a child already living with and closely bonded to the person with the disqualifying criminal conviction.

In *Matter of Abel,* a child had formed an "inseparable bond" with maternal relatives. (*Matter of Abel, supra,* 33 Misc.3d at p. 712.) However, a conviction of robbery disqualified the prospective adoptive father for placement under language recently added to New York's statutes. (*Id.* at pp. 714-717.) *Abel* held an order removing the child from the home "would deprive both [the child] and the [caregivers] of their due process right to an individualized determination of whether this adoption is in [the child's] best interest." (*Id.* at pp. 717-718.)

In *In re Adoption of Jonee*, four children had lived for seven years with an aunt who had a 20-year-old disqualifying conviction of second degree manslaughter arising out of the stabbing death of her abusive boyfriend. (*In re Adoption of Jonee, supra,* 181 Misc.2d at pp.824-825.) The children viewed the aunt as a "loving parent" and the family shared a "deep bond." (*Ibid*.) *Jonee* identified the liberty interest at stake as "the right of all members of an intact, biological, extended family to continue residing as a family unit." (*Id.* at p. 826.) *Jonee* found a recent statutory amendment unconstitutional where it would have required removal of the children from the only stable home they had ever known and "all the evidence . . . demonstrates [the aunt] has

provided nothing less than excellent care for the children throughout the years and that an intact family exists." (*Id.* at pp. 828-829.)

In *In re Adoption of Corey*, three children had lived with an unrelated foster family for more than a year and a half and had developed a closely bonded relationship. The prospective adoptive father had a conviction of armed robbery. However, he had engaged in rehabilitation efforts and the children were placed with the family before the statute that disqualified the home was enacted. (*In re Adoption of Corey, supra,* 184 Misc.2d 437 at pp. 439-440.) *Corey* found the statute unconstitutional because it would arbitrarily deprive the children of "the only loving family relationship" they had experienced. (*Id.* at p. 446.)

Thus, each of these cases recognized a child's interest to remain in a loving and secure home, regardless of whether a biological relationship existed between child and caregiver.[2] H.K. and C.K. do not have a similar relationship.

California cases also have recognized a child's interest in the stability of maintaining an existing placement in which the child has bonded with his or her caregivers, regardless of any biological relationship. (See, e.g., *In re Bridget R.* (1996) 41 Cal.App.4th 1483, 1503-1504, 1507, superseded by statute on another ground as stated in *In re Santos Y.* (2001) 92 Cal.App.4th 1274, 1311-1312.)

*Bridget R.* found the Indian Child Welfare Act (ICWA) unconstitutional as applied to children who had been relinquished for adoption by parents who later sought to rescind the relinquishment based on failure to comply with the ICWA to permit the children to be raised by paternal family members rather than their unrelated pre-adoptive parents. (*In re Bridget R., supra,* 41 Cal.App.4th at p. 1495.) *Bridget R.* found the children had a constitutionally protected interest to "remain through their developing years in one stable and loving home." (*Id.* at p. 1502.) *Bridget R.* did not identify a fundamental right of the

---

[2]     The situation presented in the New York cases is not likely to occur in California. *Los Angeles County Dept. of Children & Family Services v. Superior Court, supra,* 112 Cal.App.4th at pp. 519-520, held Welfare and Institutions Code section 361.4 does not apply to a child in an existing relative placement.

children to be raised by family members. Instead, it found the children had a constitutionally protected interest in remaining with the adoptive parents, with whom they had formed a bonded family. (*Id.* at pp. 1506-1507.) *Bridget R.* subjected the ICWA to strict scrutiny, found it was unconstitutional as applied and reversed the order sending the children to live with paternal family members. (*Id*. at pp. 1507-1508.)

Here, H.K. has seen C.K. only occasionally in her life and he has always lived in a different state. This is not the type of bonded, quasi-family relationship that courts have found worthy of protection as a fundamental interest. H.K. cites no case that acknowledges a fundamental right to placement with a relative with whom the child has no quasi-parental relationship.

We therefore conclude H.K. does not have a fundamental interest in placement with C.K.

5. *The prohibition against placement of dependent children with individuals who have been convicted of violent felonies passes constitutional muster.*

Because the restriction on H.K.'s placement with C.K. does not interfere with a fundamental right, we test the statute under the rational relationship test. Under this test, only a rational relationship to a legitimate state purpose is necessary to uphold the constitutional validity of the legislation. (*Washington v. Glucksberg*, *supra*, 521 U.S. at p. 728.)

Here, the state purpose served by the legislation is the protection of abused or neglected children. "[T]he welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect. [Citations.]" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.) Also, Welfare and Institutions Code section 361.4 was added by the Legislature in 1998 as part of the Lance Helms Child Safety Act, so named for a toddler who was murdered by his father. (*Los Angeles County Dept. of Children & Family Services v. Superior Court, supra,* 126 Cal.App.4th at p. 150.) The legislative history makes clear that section 361.4 was enacted in response to situations in which children removed from abusive or neglectful parents suffered abuse or neglect at the hands of their new caregivers. (*Ibid*.)

The prohibition against placement of dependent children with individuals who have been convicted of violent felonies is rationally related to the protection of children, as it prevents placement with individuals who have convictions of violence that indicate they present a risk of harm to children in their care. Welfare and Institutions Code "section 361.4 represents the Legislature's determination that it would *not* be in the best interest of the dependent child to be placed with a relative with a disqualifying criminal conviction." (*Los Angeles County Dept. of Children & Fam. Services v. Superior Court*, *supra*, 87 Cal.App.4th at p. 1168.)

The presumption that an individual who has killed either recklessly with extreme indifference to the value of human life, or intentionally while under an extreme emotional disturbance, represents a danger to children placed in his or her home is logical and rationally related to the protection of children. The presumption is justified because it is based on the prior determination via conviction that an individual has acted violently and therefore poses a risk to society. Under these circumstances, the state's compelling interest and obligation to protect children in foster care justifies the prohibition against placing a child with a relative who has been convicted of voluntary manslaughter.

H.K. argues the result should be different based on the preference given to relatives in placement of dependent children. However, even when considering a relative placement, "the court is not to presume that a child should be placed with a relative, but is to determine whether such a placement is *appropriate*, taking into account the suitability of the relative's home and the best interest of the child." (*In re Stephanie M*. (1994) 7 Cal.4th 295, 321.)

It is appropriate for the Legislature to determine the risk to a child's safety is sufficiently high based on a conviction of voluntary manslaughter to justify not placing the child with a person with whom the child has not already formed a parental relationship. We therefore conclude the Legislature may prohibit placement with relatives who have been convicted of serious crimes without violating a child's due process rights.

## DISPOSITION

The order under review is affirmed.



KLEIN, P. J.


We concur:



CROSKEY, J.



ALDRICH, J.

Filed 7/18/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re H.K., a Person Coming Under the Juvenile Court Law. | B242800 |
| _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK49248) |
| Plaintiff and Respondent, | ORDER CERTIFYING OPINION FOR PUBLICATION [NO CHANGE IN JUDGMENT] |
| v. | |
| H.K., | |
| Defendant and Appellant. | |

THE COURT:

The opinion in the above-entitled matter filed on June 26, 2013, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

[There is no change in the judgment.]