Filed 11/5/13  In re K.S. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re K.S., a Person Coming Under the Juvenile Court Law. | B246773 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK43480) |
| Plaintiff and Respondent, | |
| v. | |
| SHAWN C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County. Philip L. Soto, Judge. Affirmed in part, reversed in part and remanded with directions.

Maryann M. Milcetic, under appointment by the Court of Appeal, for Appellant.

John F. Krattli, County Counsel, James M. Owen, Assistant County Counsel, Jeanette Cauble, Deputy County Counsel, for Respondent.

_____

Shawn C. (father) appeals from the dispositional order removing his newborn daughter, K.S., from his custody pursuant to Welfare and Institutions Code section 361, and ordering father to drug test.[1]  He contends:  (1) the order was not supported by substantial evidence; (2) requiring father to drug-test was an abuse of discretion; and (3) there was non-compliance with the Indian Child Welfare Act (ICWA).  We conclude the dispositional order is supported by substantial evidence, but agree that the case must be remanded for ICWA compliance.

## FACTUAL AND PROCEDURAL BACKGROUND

Father and mother were not married but lived together while mother was pregnant with K.S.  Also living with them was 43-year-old William Vanhorn, whom father thought of as an adopted son.  The family came to the attention of the Department of Children and Family Services (DCFS) when mother tested positive for amphetamines immediately after giving birth to K.S. on October 12, 2012.[2]  K.S. also exhibited significant withdrawal symptoms.  Mother initially told a hospital representative that she lived with a roommate, K.S.'s father was unknown, and mother wanted to give her up for adoption.  Mother subsequently identified father to the investigating social worker.  Father told the social worker that he knew mother used drugs while pregnant; he encouraged her to stop doing so and thought she was getting better.  Father rejected a plan to place K.S. with him because mother would have to move out of the home and she had nowhere to go.  Instead, father and mother consented to K.S. being placed in foster care.  K.S. was three days old when she was detained and placed in a prospective adoptive foster care home.

The next day, father told the social worker that he could not be solely responsible for K.S.'s care and custody, but he had a friend who would assist him temporarily.  Nevertheless, father agreed to have K.S. remain in her current placement.  Father was

---

[1]     All future undesignated statutory references are to the Welfare and Institutions Code.

[2]     Because mother is not a party to this appeal, we mention her only to the extent her conduct is relevant to father's appeal.

amenable to an "open" adoption in which he would be able to have an ongoing relationship with K.S. On October 18, 2012, DCFS filed a petition alleging K.S. was a person described by section 300, subdivision (b) for the following reasons:

> "[Mother] has an eleven year history of substance abuse, including amphetamine, methamphetamine and opiates, and is a current user of amphetamine, methamphetamine and opiates, which renders [mother] incapable of providing regular care of the child. [Mother] used illicit drugs throughout [her] pregnancy []. On [September 3, 2012, mother] had a positive toxicology screen for amphetamine. The child's [five older siblings] received permanent placement services due to mother's illicit drug use. [Father] knew of the mother's illicit drug use and failed to protect the child. [Mother's] use of illicit drugs and [father's] failure to protect the child endangers the child's physical health and safety and creates a detrimental home environment, placing the child at risk of physical harm, damage and failure to protect."

At the detention hearing on October 18, 2012, mother and father denied the petition. They indicated that mother would move out of the family home so that father could request custody of K.S. after he had a daycare plan in place. Regarding father drug testing, there ensued the following colloquy:

> "[K.S.]'S COUNSEL: I would join [father's request to have K.S. placed with him], but I would only ask that in light of mother's history and reading of the petition, I'd ask if the father is willing to drug test in the interim and provide that. . . . [¶] [COUNTY COUNSEL]: . . . [¶] . . . I think, frankly, that since father indicates in the report at least that he was aware of mother's use that maybe it would be a good idea for him to do a test or two, and it would kind of relieve some of our concerns. [¶] FATHER: No problem."

The juvenile court found DCFS had made a prima facie case for detaining K.S. It ordered mother and father to drug test and DCFS to address a home of father placement in the Pretrial Resolution Conference (PRC) report; DCSF was directed to "walk on" any request to release K.S. to father. DCFS was also given discretion to release K.S. to any appropriate relative and to investigate placing her with her half-siblings, who had been adopted by a maternal relative. The matter was continued to November 14, 2012, for a jurisdictional hearing.

3

Mother was arrested on October 30, 2012, after ammunition was found in her home, a violation of her probation. She was released on November 10, 2012, and a probation violation hearing was scheduled for November 14, 2012. The jurisdiction hearing set for that day was continued to December 7, 2012.

According to the Jurisdiction Report, father had known mother for three years when they became romantically involved in January 2012, soon after father's wife died. Father never saw mother use drugs, but she told him she was doing so; father told mother she needed to get help. Father believed mother received prenatal care, but did not know any details.

Father explained that he and his late wife met William Vanhorn (the "adopted" son") 15 years ago, when Vanhorn lived in their private group home. Since then, Vanhorn had lived with father off-and-on. Vanhorn would not live scan, but a California Law Enforcement Telecommunications System (CLETS) search revealed he had an extensive criminal history, beginning with a 1987 conviction for receiving stolen property. Convictions for vandalism, theft, grand theft, domestic violence, possession of a dangerous weapon and multiple drug related offenses followed. The most recent incident was a 2012 warrant for driving under the influence. When interviewed on October 30, 2012, Vanhorn told the social worker he had no concerns for his family and "had nothing more to say." On November 5, 2012, after the social worker told father that DCFS was not recommending reunification services for mother, father stated that he wanted to terminate his own reunification services so that K.S. could be available for an "open adoption." DCFS concluded that it would be unsafe to return K.S. to father because he refused to relocate to a home away from mother and Vanhorn, it would be unsafe for Vanhorn to have access to K.S., and father had no one to watch K.S. during his 12-hour work shifts.

According to a Last Minute Information For The Court filed the day of the December 7, 2012 hearing, father tested negative for drugs on November 9, but was a no-show on November 20. The adoptive parent of three of K.S.'s half-siblings wanted to also adopt K.S., but father wanted K.S. to be adopted by her current foster parents

4

because they agreed to allow mother and father to continue visiting. Father did not attend the jurisdictional hearing.[3] His counsel argued there was no evidence that father had failed to protect K.S. because he encouraged mother to stop using drugs and he could not have forced her into a drug program. The juvenile court sustained the petition and adjudicated K.S. a person described by section 300, subdivision (b). It continued the disposition hearing to January 16, 2013.

According to a Last Minute Information For The Court filed the day of the hearing, father had been a no-show for all three scheduled drug tests. Father, mother and Vanhorn had been arrested on January 8, 2013, after 15,000 pirated DVD's, a stolen handgun, live ammunition and a stolen Rug Doctor carpet cleaner were found during a probation check of the home they shared. Father was charged with movie piracy, grand theft and possession of a stolen firearm; Vanhorn was charged with movie piracy. Mother remained incarcerated but father was released on bail. A few days later, father told the social worker that he was not guilty of movie piracy, but did not mention the firearm charge. Father had changed his mind about an open adoption; he wanted custody of K.S. because he could not be sure that an adoptive family would allow him to have continued contact with her. The social worker told father that K.S. could not be placed in father's home so long as mother and Vanhorn (because of his history of domestic violence and drug related convictions) lived there. Father agreed to ask mother to leave, but not Vanhorn.

Father appeared at the dispositional hearing but did not testify. In support of his request that K.S. be returned to his custody, father's counsel argued that father previously suggested waiving his reunification services only because K.S. had bonded with the foster mother and he believed that the foster parents would allow him to maintain a relationship with the child. Upon learning that K.S. was likely to be moved to her half-siblings' adoptive home, father concluded "he will no longer be able to see the baby. So he's no longer willing to waive his reunification services, because he does love this

---

[3] Father's counsel stated that father had previously agreed to a waiver on the condition that K.S. remain placed with her current foster parents.

baby." Father's counsel maintained K.S.'s return to father did not place her at any risk of harm since mother was incarcerated and father had a daycare plan in place. Regarding Vanhorn's presence in the home, counsel argued that "a parent does not need to meet the same foster care standards that a regular foster parent or relative placement would need to meet. The father just needs to make [sic] reasonable means to protect this child . . . ." K.S.'s counsel opposed returning K.S. to father, noting that if K.S. had been released to father at the detention hearing she would have been exposed to the probation search and arrest of father, mother and Vanhorn in the home. Noting that father had been a no-show to drug tests he had agreed to take, K.S.'s counsel asked that the case plan include drug testing for father.

The juvenile court placed K.S. with DCFS, finding no reasonable means to protect her from substantial danger without removing her from father's physical custody. The court-ordered case plan required father to obtain individual counseling to address proper parenting, substance abuse awareness and criminal history issues, and to participate in four random drug tests. The juvenile court advised father that reunification would require him to maintain regular visitation (three weekly three-hour monitored visits at the child's home) and stable housing, and to demonstrate the ability to meet K.S.'s physical and emotional needs. Regarding Vanhorn, the juvenile court stated: "I think you are going to have to really be serious about this 43-year-old son not being with you in the house if you want to have the baby there . . . . A 43-year-old man should be finding a place of his own to live in is my feeling. It's up to you what you are going to do. If it's a problem because of his criminal background, it might be time to sit him down and have a talk man to man, father to son, say, 'They will not let me have the child in the house if your are here. It's time to move out.' [¶] If that's going to cause a big problem, then we are going to have to deal with that. But I think you could probably work something like that out." Regarding drug testing, the juvenile court noted that the prior no-shows provided sufficient grounds to order drug testing as part of the case plan. Father objected to the disposition and the requirement that he drug test.

Father timely appealed from the dispositional order.

6

## DISCUSSION

### A.     *Substantial Evidence Supports the Removal Order*

Father contends the order removing K.S. from his custody is not supported by substantial evidence.  He argues mother was no longer living in the home and there was no evidence that Vanhorn's presence posed any danger to K.S.  We find no error.

We review the juvenile court's dispositional findings for substantial evidence.  (*In re T.V.* (2013) 217 Cal.App.4th 126, 135.)  Under that standard, we consider the evidence favorably to the prevailing party and resolve all conflicts in support of the court's order.  (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1404.)

"A dependent child may not be taken from the physical custody of his or her parents or . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . :  [¶]  (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody. . . ."  (§ 361, subd. (c)(1).)  " 'Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt.  [Citation.]'  [Citation.]"  (*In re John M.* (2006) 141 Cal.App.4th 1564, 1569.)

Once a child is removed from his or her parent, section 361.4, subdivision (d) precludes placement in a home in which the child would have contact with an adult who has been convicted of any crime other than a minor traffic violation unless an exemption is obtained.  (*Los Angeles County Dept. of Children and Family Services v. Superior Court* (2005) 126 Cal.App.4th 144, 151.)  Father correctly notes that there is no such

limitation on return of a child to his or her pre-petition home.[4] Although return to the pre-petition home is not precluded by the fact that an adult with a criminal history lives in the home, it is a fact that may be considered in determining whether the child can be safely placed there. Evaluation requires the court to weigh all relevant factors to determine if the child will suffer harm. (Cf. *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1425 [construing § 361.2, governing placement with non-custodial parent].) The juvenile court may compel a parent to choose between the child and a source of potential danger to the child, thus demonstrating the parent's ability to protect the child. (See e.g. *In re Silvia R.* (2008) 159 Cal.App.4th 337, 351 [removal order supported by mother's refusal to have child's step-father and adult brother, both of whom were accused of molesting child, move out of home]; *In re Mariah T.* (2008) 159 Cal.App.4th 428, 441 [removal order supported by mother's refusal to have boyfriend accused of molesting the child move out of the home].)

Here, the evidence justified the juvenile court's finding that K.S. would be at substantial risk if she were returned to father and Vanhorn continued to reside in the home. This includes the undisputed evidence that Vanhorn had an extensive criminal record which included domestic violence and multiple drug related offenses. The finding is also supported by more recent events: a week before the hearing, Vanhorn was arrested in the home, along with father and mother; a stolen weapon was found. Given a choice of having K.S. placed with him and asking Vanhorn to leave, or having K.S. placed outside the home, father elected the foster placement. It is axiomatic that

---

[4]     Section 361.4 does not apply to placement with a non-custodial parent or return to a pre-petition home. (See *In re H.K.* (2013) 217 Cal.App.4th 1422, 1430 ["When a child is to be placed with a relative, extended family member or any person (other than his or her noncustodial parent) who is not a licensed certified foster parent, Welfare and Institutions Code section 361.4 requires a criminal records background check of the applicant. [Citation.]"]; *In re John M., supra*, 141 Cal.App.4th at p. 1573 [investigation into parent's home is less rigorous than investigation into other relative placements]; *In re Summer H.* (2006) 139 Cal.App.4th 1315, 1330 [§ 361.4 is a placement statute; it applies when a child has been removed from the physical custody of his or her parents pursuant to § 361].)

Vanhorn's participation in criminal activities in the home exposes K.S. to substantial danger. Father's refusal to ask Vanhorn to leave puts father's judgment in question. Under these circumstances, we find no error in the juvenile court's order removing K.S. from father's custody.

We are not persuaded otherwise by father's citations to cases in which parents acted more egregiously than father has in this case. It is not relevant that other parents have put their children at risk of even more serious danger than the danger in which father has put K.S.; it is only relevant that there was substantial evidence to support the juvenile court's finding that return to father presented a substantial risk to K.S.

In a related argument, father contends the finding that there were no reasonable alternatives to removing K.S. from his custody is not supported by substantial evidence. As we have already explained, father rejected the reasonable alternative presented to him by DCFS: asking Vanhorn to move out so that K.S. could be returned. Father's refusal to have Vanhorn move out constitutes substantial evidence that there was no reasonable means to protect K.S. other than removing her from father's custody.

### B. *Substantial Evidence Supports the Drug-Test Requirement*

Father contends the juvenile court abused its discretion in requiring father to drug test as part of the case plan. He argues that there was no evidence that father had a substance abuse problem. We disagree.

"The program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the minor is a person described by Section 300." (§ 362, subd. (c).) The juvenile court has authority to order a parent to drug test as part of a reunification plan. (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1229.) But only if that condition is reasonably related to ameliorating the conditions that caused the child to be a dependent child. Unless a parent's drug use led to jurisdiction, a reunification plan requiring the parent to drug test does not meet that standard. (*In re Basilio T.* (1992) 4 Cal.App.4th 155.) However, if a substance abuse problem is discovered during the pendency of the case, the trial court has discretion to

9

include reunification conditions to address that problem. (*Id*. at p. 173, fn. 9; see also *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008.)

This case presents a somewhat unusual situation in that father denied using drugs, but at the detention hearing volunteered to drug test. Father then tested negative once, but missed all subsequent tests. Juvenile courts regularly treat a missed test as a "dirty" test. (Cf. *In re Raymond R.* (1994) 26 Cal.App.4th 436, 439.) Thus, notwithstanding father's initial denial, the juvenile court could reasonably conclude that father had a substance abuse problem from the evidence that father tested "dirty" a number of times. Under these circumstances, it was not an abuse of discretion for the juvenile court to include drug testing in father's reunification plan.[5]

## C.     Remand for ICWA Compliance

We agree (and DCFS concedes) that the case must be returned to the juvenile court for ICWA compliance. At the detention hearing on October 18, 2012, father indicated that his maternal grandmother was a member of the Apache tribe. We need not reverse under those circumstances, but only remand for the limited purpose of compliance. (*In re Brooke C.* (2005) 127 Cal.App.4th 377, 385–386, *contra, Nicole K. v. Superior Court* (2007) 146 Cal.App.4th 779, 781.)

## DISPOSITION

The jurisdictional findings and dispositional order are affirmed. The finding that ICWA does not apply is conditionally reversed and the matter is remanded for compliance with the notice requirements of ICWA. If, after inquiry and proper notice, the court finds that K.S. is an Indian child under ICWA, the court shall proceed in conformity with ICWA. If, however, the juvenile court finds that K.S. is not an Indian

---

[5]     At father's request, we take judicial notice of the juvenile court's minute order of July 17, 2013, requiring father to submit to drug testing. Father's counsel represented at oral argument that father has not appealed that order.

child, the finding that ICWA does not apply shall be reinstated and all other orders shall remain in full force and effect.



RUBIN, J.

WE CONCUR:


BIGELOW, P. J.


GRIMES, J.