Filed 12/14/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re D.R., a Person Coming Under the Juvenile Court Law. | B269663 (Los Angeles County Super. Ct. No. DK01646) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Appellant, v. C.R. et al., Defendants and Respondents; D.R., Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Marguerite D. Downing Judge.  Reversed.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, and Jeanette Cauble, Deputy County Counsel, for Plaintiff and Appellant.

Jeanette Freeman Cochran, under appointment by the Court of Appeal, for Appellant.

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Respondent C.R.

Kate M. Chandler, under appointment by the Court of Appeal, for Defendant and Respondent E.M.

D.R. was born in November 2004. She lived with her maternal grandmother since she was an infant and felt safe in her grandmother's home and loved by her grandmother. She was "thriving" in her grandmother's care. D.R.'s two half siblings lived in the same apartment building as D.R. with D.R.'s maternal great-grandmother.

C.R., D.R.'s father (father), who initially was described as "whereabouts unknown," eventually was located at the home of his mother and stepfather, where he lived. Father had been convicted of statutory rape of D.R.'s mother prior to the dependency proceedings. Father did not see D.R. after he was released from incarceration. His name was not on D.R.'s birth certificate. Father visited D.R. for only a four-month period during the dependency proceedings, after which he stopped visiting. Father did not attend conjoint therapy with D.R.

This appeal concerns D.R.'s permanent plan. The juvenile court selected legal guardianship over adoption. On appeal, both D.R. and the Los Angeles County Department of Children and

2

Family Services (DCFS) challenge the order of legal guardianship. After review, we conclude that the trial court was required to select the more permanent plan of adoption. No substantial evidence supported the court's rationale for selecting legal guardianship instead of adoption. We therefore reverse the legal guardianship order.

**BACKGROUND**

## 1. Petition

On October 7, 2013, DCFS filed a Welfare and Institutions Code[1] section 300 petition identifying grounds for juvenile court jurisdiction over mother's three children—D.R. and her half siblings Aa.G., and Aw.G. At that time father's whereabouts were unknown. Allegations in the petition concerned mother and A.G., the father of Aa.G. and Aw.G.

As later sustained following mother and A.G's stipulation, the petition alleged that mother and A.G. engaged in a violent altercation with other family members and mother struck her cousin with a bat. A.G. hit mother's relative. Mother possessed methamphetamine, marijuana, a drug pipe, and a loaded firearm. Mother also used methamphetamine and marijuana. A.G. used methamphetamine and marijuana and had a criminal history involving possession of a controlled substance and being under the influence of a controlled substance.

## 2. Mother and A.G. Failed to Reunify with the Children

After the juvenile court sustained the allegations in the petition, mother and A.G. were given reunification services. Mother and A.G. failed to comply with their case plans, and their reunification services eventually were terminated. Without

---

[1] All statutory citations are to the Welfare and Institutions Code.

objection, adoption was selected as the permanent plan for Aa.G. and Aw.G.

### 3. *Father C.R.*

As noted, father's whereabouts were not known at the detention hearing. The court initially stated that father was "apparently a presumed father." But then, after questioning mother the court revised its determination, stating that father was the "legal father." Father's paternity form indicates that on October 18, 2013, the juvenile court found him to be an "alleged" father. The court's minute order dated October 18, 2013, confirms this finding, stating: "The court finds that the following person is the alleged father only of the minor [D.R.]: [C.R.]" (Capitalization omitted.) In all of its reports, DCFS identified father as an alleged father.

Father had not been located for the November 2013 jurisdictional hearing.

In February 2015, a social worker located father. DCFS investigated father's criminal history, which included criminal threats, possession of a controlled substance, sex with a minor three years younger than father, misdemeanor driving while under the influence of alcohol, misdemeanor disobeying a court order, misdemeanor battery, and robbery. When DCFS contacted father, father stated that he desired custody of D.R. He began visiting her, and his visits initially were described as "going well." Father progressed from monitored to unmonitored visits.

In March 2015, DCFS reported that father wanted to reunify with D.R. DCFS concluded that "[b]ased on the fact that [D.R.] is starting to bond with her father, it is in the best interest of the child to remain [a] dependent of the Court and under supervision from DCFS." However, DCFS further concluded that

4

D.R. would be at moderate risk of abuse if released to father's care and emphasized that father had not been in a parental relationship with D.R. for 10 years.

In April 2015, maternal grandmother reported that D.R. was not being fed while in father's care. Maternal grandmother also reported that D.R. did not want to live with father. D.R. told her therapist that she wanted to have visits with father but did not want to live with him. D.R. wrote the juvenile court a letter stating that she did not want to live with father. Her letter stated that "for the past 10 years I have been living with the family that has been with me for the sad moments fun moments and proud moments that my dad hasn't been there."

In June 2015, father reported that he wanted D.R. to live with him. D.R. did not want to live with father. D.R.'s therapist recommended conjoint therapy in order that D.R. and father develop a healthier relationship.

In August 2015, DCFS reported that D.R. did not want conjoint therapy with father but nevertheless agreed to it. She had not visited father for two weekends. Father reported that he did not visit because he did not have a vehicle but promised to visit the following weekend. Father did not appear for his promised visit. Father also did not appear for the scheduled conjoint therapy session with D.R.

Also in August 2015, DCFS reported that father did not appear at 11 regularly scheduled visits or at a scheduled conjoint therapy session. Father never rescheduled the conjoint therapy and had *no* sessions with D.R. DCFS recommended terminating father's reunification services and leaving D.R. in the care of her grandmother.

Father did not appear at a court hearing scheduled for August 11, 2015, concerning his reunification services. The court found that returning D.R. to father's custody would create a substantial risk of detriment and would result in either severe emotional or severe physical harm. The court terminated father's reunification services.

In October 2015, father told a social worker that he did not want to lose his parental rights but also did not want to force D.R. to live with him. Father confirmed that his last visit had been May 24, 2015. Father had received a copy of the following letter from D.R.:

"Dear, Judge

"I know that you said that I had to sleep over my dad house and so I just want one last attempt so you can know that I am horrible, hurt, ruined, burned up because I am going to miss my aunts, grandma, great grandma cousins and mom, and brothers because of a small change I just feel like my heart stopped and sadness and I just can't say thing to my dad that are personal because I need my aunts becaues they are the only ones that understand. And I am not going to have the same house or close friends or family birthday partys. and <u>everything is not the same</u>. [¶] Please I am begging and praying that you would listen to me please." (*Sic*.)

In December 2015, DCFS reported that father had not made efforts to see D.R. since May 24, 2015. Father did not appear for scheduled visits in April, May, June or July, and no further visits had been scheduled. Father still had not called D.R.'s therapist to set up a conjoint counseling session.

### 4. *Maternal Grandmother Sought to Adopt D.R.*

In March 2015, maternal grandmother reported that she was willing to adopt D.R. D.R. reported that she "likes living with her grandmother and she is happy there."

In June 2015, grandmother reaffirmed that she was willing to adopt D.R.

In December 2015, DCFS reported that grandmother's homestudy was approved. DCFS reported that grandmother loved D.R. and was committed to adopting her.

### 5. *The Court Selects Legal Guardianship As D.R.'s Permanent Plan*

No witness testified at the section 366.26 hearing. Father's counsel argued that the exception under section 366.26, subdivision (c)(1)(B)(i) applied and that therefore adoption should not be D.R.'s long-term plan. That exception applies when a parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) Father's counsel requested legal guardianship as D.R.'s long-term plan. Father's counsel argued that maternal grandmother manipulated the situation by failing to provide his information sooner and that father decided not to visit because D.R. was uncomfortable with visitation. Counsel acknowledged that father did not have a "strong relationship" with D.R. Counsel however argued that father "made the effort that he could" but D.R. did not want to see him. Mother's counsel argued that mother visited regularly and had a strong relationship with D.R.

On December 30, 2015, the court ordered legal guardianship as D.R.'s permanent plan. The court's order stated that "[t]he child is living with a relative who is unable or

7

unwilling to adopt the child because of circumstances that do not include an unwillingness to accept legal or financial responsibility for the child, but who is willing and capable of providing the child with a stable and permanent environment through legal guardianship."

The court found that it would be detrimental to place D.R. in father's custody. Father consented to guardianship, and the court terminated its jurisdiction.

## DISCUSSION

### *1. Substantial Evidence Does Not Support the Juvenile Court's Conclusion That an Exception to Adoption Existed*

Under the circumstances of this case, the trial court was required to order adoption as D.R.'s permanent plan because, as explained, it is the preferred permanent plan when no exception exists. Section 366.26 governs the selection of a permanent plan for a dependent child and carves out six exceptions, only one of which was relied upon by the juvenile court. Absent one of these exceptions, if the child is adoptable—and it is undisputed that D.R. was adoptable—the juvenile court must select adoption as the child's permanent plan. (*In re Jasmine T.* (1999) 73 Cal.App.4th 209, 213 [absent an exception, "the court must order adoption as the permanent plan for a child found likely to be adopted"]; *In re Casey D.* (1999) 70 Cal.App.4th 38, 50 ["If a child is likely to be adopted, adoption is the plan preferred by the Legislature."]; *In re Jose V.* (1996) 50 Cal.App.4th 1792, 1798 [if no exception to adoption applies adoption will be " 'relatively automatic' "].)

The exception to adoption relied on by the juvenile court was as follows: D.R.'s grandmother was "unwilling to adopt the child because of exceptional circumstances, that do not include an

unwillingness to accept legal or financial responsibility for the child, but who is willing and capable of providing the child with a stable and permanent environment and the removal of the child from the physical custody of his or her foster parent . . . would be detrimental to the emotional well-being of the child." (§ 366.26, subd. (c)(1)(B)(iv).

No evidence supported this exception. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 535 ["Generally, we review the trial court's application of the exception to the termination of parental rights for substantial evidence."].) D.R.'s grandmother was *willing* to adopt D.R., repeatedly expressed a desire to adopt D.R., and had an approved home study. Grandmother's homestudy had been approved prior to the court's legal guardianship order, and grandmother had repeatedly reaffirmed her desire to adopt D.R. The juvenile court's conclusion that an exception applied because D.R.'s caretaker was unwilling to adopt is not supported by any evidence in the record. Nor was there any support for a conclusion that grandmother was unable to adopt as she had an approved home study.

## 2. Mother's and Father's Arguments That the Juvenile Court Could Not Terminate Father's Parental Rights Lack Merit

Neither mother nor father argue that substantial evidence supported the exception to adoption relied on by the juvenile court. Neither mother nor father argues that any section 366.26 exception to adoption is applicable to this case.

Instead, mother and father argue that the legal guardianship order must be affirmed because father was a presumed father and the trial court failed to make a finding of

9

detriment necessary to terminate his parental rights.  The record belies these arguments.

The record can support only the conclusion that father was an alleged father.  Although the court initially stated that "apparently" father was a presumed father it then questioned mother and concluded father was only an alleged father.  This conclusion is documented both in the court's minute order and in the court's signature after checking the box "alleged" on the paternity questionnaire.  There is no record support for the conclusion that father was adjudicated to be a presumed father.[2]

Mother and father's argument that the fact father received reunification services shows that he was a presumed father is incorrect.  While a presumed father is entitled to reunification services, a biological father may receive such services if it is in the best interest of the child.  (*In re A.A.* (2003) 114 Cal.App.4th 771, 780 [" 'the juvenile court *may* order services for the child and the biological father . . .' "]; see *Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 597.)  Additionally, the trial court may have erred in ordering reunification services for father, an error that accrued to his benefit.

The trial court may not terminate a presumed father's parental rights without finding that awarding custody to him would be detrimental to the child.  (*In re T.G.* (2013) 215 Cal.App.4th 1, 20.)  Here, the court was not required to find

---

[2]      To the extent father is seeking to adjudicate this for the first time on appeal, he cannot raise it on appeal in the first instance.  (*In re Margarita D.* (1999) 72 Cal.App.4th 1288, 1296; see *In re Jason J.* (2009) 175 Cal.App.4th 922, 932-933.)

10

detriment because father was an alleged, not a presumed, father.[3]

In short, the juvenile court's determination that an exception to adoption applied was not supported by any evidence. Neither mother nor father demonstrate any other impediment to ordering adoption as D.R.'s permanent plan. Because the Legislature has expressed a preference for adoption absent an exception, the juvenile court erred in not ordering adoption as D.R.'s permanent plan.

## DISPOSITION

The juvenile court's order of legal guardianship is reversed. The juvenile court is directed to enter a new order of adoption as D.R.'s permanent plan.

FLIER, J.

WE CONCUR:

RUBIN, Acting P. J.

GRIMES, J.

---

[3] Father cursorily claims that his counsel may have been ineffective in failing to seek presumed father status but argues any error was not prejudicial. We agree that any assumed error would not be prejudicial. The juvenile court found that it would be detrimental to place D.R. in father's custody and *no* evidence supported a different finding.