Filed 5/5/23

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re C.P., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E078696 |
| Plaintiff and Respondent, | (Super.Ct.No. J271063) |
| v. | OPINION |
| M.P., et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County. Steven A. Mapes, Judge. Reversed with directions.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendants and Appellants.

Tom Bunton, County Counsel, and David Guardado, Deputy County Counsel, for Plaintiff and Respondent.

This is the second appeal in this dependency case. Appellants are the maternal grandparents of the dependent child C.P. At a permanency hearing under Welfare and Institutions Code section 366.26, the juvenile court ordered a legal guardianship for the

1

child and appointed grandparents as his guardians.[1]  Grandparents contend that the court should have instead selected adoption as the child's permanent plan and designated them as the child's prospective adoptive parents.  We agree with grandparents and therefore reverse the order of legal guardianship.  We direct the juvenile court to reconsider the matter given this opinion and any changed circumstances.

## I. FACTS

In our opinion on grandparents' first appeal, we stated: "The child (born 2011) was removed from mother's custody in May 2017, after he was sexually abused by a maternal uncle; at the time of removal, mother, child, and uncle all resided in the home of the grandparents.  The uncle is now incarcerated on a 20-year sentence for child molestation.  Mother has been out of contact with San Bernardino County Children and Family Services (CFS), and reportedly has moved out of state.  The child was initially placed with a foster family, but in June 2017 he was moved to a group home capable of addressing his special health care needs related to autism." (*In re C.P.* (2020) 47 Cal.App.5th 17, 21 (*In re C.P. I*).)

"The grandparents started the resource family approval process, with the goal of having the child placed in their care, almost immediately after the child was removed from mother's custody in May 2017. [....]  During the process, however, a criminal background check revealed that the grandfather had a 1991 misdemeanor conviction under Penal Code section 273d, which is disqualifying under Health and Safety Code

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

2

section 1522. [Citation.] Penal Code section 273d applies to '[a]ny person who willfully inflicts upon a child any cruel or inhuman corporal punishment or an injury resulting in a traumatic condition . . . ." (Pen. Code, § 273d, subd. (a).) According to grandfather's account of the circumstances giving rise to this conviction—the only account in our record—he pleaded no contest, and was sentenced to probation and required to take anger management classes after he was accused of pushing his wife and son during, or while trying to walk away from, an argument." (*In re C.P. I*, *supra*, 47 Cal.App.5th at p. 22.)

"Grandfather successfully took steps to have his name removed from the Child Abuse Central Index (CACI), the database maintained by the Department of Justice regarding reports of known or suspected child abuse or severe neglect. (See *In re C.F.* (2011) 198 Cal.App.4th 454, 462-463 [discussing CACI and process of removing reports from CACI].) Grandfather also obtained a dismissal of the charge pursuant to Penal Code section 1203.4." (*In re C.P. I*, *supra*, 47 Cal.App.5th at pp. 22-23.) "Nevertheless, in November 2018, CFS issued grandfather a "Notice of Action to Individual Regarding Resource Family Approval Criminal Record Exemption Decision," stating that the grandparents' application for resource family approval must be denied because of the grandfather's conviction." (*Id.* at p. 23.)

In our earlier opinion, we reversed the juvenile court's order denying grandparents' request for an order that CFS reassess their application to be approved as a resource family. (*In re C.P. I*, *supra*, 47 Cal.App.5th at p. 31.) We held that if grandfather has a *parental* relationship with C.P. (as distinguished from a grandparental

3

relationship), he is constitutionally entitled "to an individual analysis of his exemption request, rather than the application of an absolute statutory bar . . . ." (*Id.* at p. 24.) We emphasized "that the Legislature's determination that an offense constitutes an absolute bar to placement must still be considered as the starting point in the analysis when it applies." (*Id.* at p. 30.) We found, however, that "due process requires that a person who has a parental relationship with a child receive a more individualized determination when placed in a broad category for disqualification." (*Ibid.*) We remanded for the juvenile court to make the "predicate factual determination" of whether grandparents' relationship with the child "is the sort of 'bonded, quasi-family relationship that courts have found worthy of protection as a fundamental interest'" and then to proceed accordingly.[2] (*Id.* at p. 31, quoting *In re H.K.* (2013) 217 Cal.App.4th 1422, 1435.)

In September 2020, the juvenile court found that grandparents have such a relationship with the child. Indeed, the issue was undisputed. CFS reported that grandparents' relationship with C.P. began "when they brought him home from the hospital twenty-four hours after his birth." Five months later, when mother moved in with grandparents and the child after being released from prison, grandparents initially "assumed more of a grandparent role," but "'always watched over'" both mother and child. Mother did well for about a year, but then her behavior deteriorated and grandparents "reassumed the parental roles of caring for [the child] and his daily physical

---

[2] Later, the Legislature codified and expanded on our holding by adopting Senate Bill No. 354 (2021-2022 Reg. Sess.) (Senate Bill 354), which took effect January 1, 2022. We discuss these legislative changes below.

and emotional needs when mother was not home which was approximately half of every month." By December 2016, grandparents had taken over all "parental duties," as mother was present in the home only "on occasion" and "did not stay for long and did not tend to [the child's] needs when she was there." Grandparents continued to "grow their relationship with their grandson" after C.P.'s May 2017 removal, visiting consistently and as often as permitted by the juvenile court. Their visitation was increased incrementally, and by February 2019 the court authorized grandparents to have overnight visits every weekend. CFS reported the child "is eager to leave 'to go home' every Friday and transitions back into the group home, and the routine, very well every Monday."

In the same September 2020 hearing, the juvenile court ordered CFS to reassess grandparents for approval as a resource family. Its instruction was as follows: "I will direct and order the Department to initiate and perform another RFA as though the 1203.4 offense were exemptible [and I grant CFS] authority to place [C.P.] with [grandparents] upon RFA approval. But, understanding that that prior 1203.4 dismissal of that whole case will not be held against them . . . I'll order the Department not to consider that old case that was, in fact, dismissed at the end of probation successfully." The court also authorized additional visitation, including not only weekends but also during the week, on a schedule that "works for the family."

In April 2021, CFS reported that grandparents "have completed the criminal exemption, home evaluation and grandparents' interviews as conducted by the Resource

5

Family unit." Interviews with mother and child remained pending. At CFS's direction, grandparents were participating in therapy, with the therapist indicating "she will provide a progress report at the completion of services, though so far she was very impressed with their honesty and openness about the history." As of an April 9, 2021 hearing, the child had been on an extended visit with grandparents for 29 days, and did not wish to return to the group home. At the grandparents' request and without objection by any party, the juvenile court authorized continuation of the extended visit. The juvenile court also authorized CFS to place the child with grandparents "full time."

On June 30, 2021, CFS reported that grandparents' "criminal exemption and conduct assessment is still under review and the report is in progress," but that it anticipated that the home would be approved. Grandparents had completed the therapy sessions as directed, and the therapist had submitted a progress report. C.P. continued his extended visit with grandparents, and the social worker had "observed him to be happy and content." The child expressed that he understood "'paperwork'" needed to be finished, but stated: "'I just want it done already so I know I don't have to go back to [the group home], or live anywhere else.'"

On July 2, 2021, grandparents applied for an order to show cause (OSC) why CFS should not be held in contempt for failing to complete its resource family approval assessment. At a hearing on the same date, the juvenile court observed that it anticipated grandparents would be approved as a resource family within a few weeks. The court accepted CFS's recommendation that adoption should be the child's permanent plan and

6

set a section 366.26 hearing for November 2021.  It continued the hearing on grandparents' OSC application to the same date, with the proviso that grandparents' counsel could apply to have the hearing advanced if needed.  The court authorized grandparents to retrieve the child's belongings from the group home and to enroll the child in school.  It instructed CFS to "let us know" within 30 days if the child's extended visit with grandparents was "actually a placement."

On July 29, 2021, grandparents were approved as a resource family.  The approval was specific to C.P., rather than broad approval to serve as a resource family for any dependent in out-of-home placement.  (See § 16519.5, subd. (c)(4)(B)(i) [authorizing child-specific approval].)  On August 5, 2021, the child was "officially placed" with grandparents.

In October 2021, CFS reported that the "full time transition" to grandparents' care was "uneventful."  The child continued "to do well in the care of his grandparents," who were providing the child "with the supports, advocacy, consistency, love and encouragement he needed to succeed and grow."  CFS opined that the child's adoption by grandparents was "highly likely," observing that there "is currently no known barrier to the Termination of Parental Rights and completion of the adoption process." Nevertheless, CFS requested, and the juvenile court granted, a 120-day continuance of the section 366.26 hearing to complete a transition from the previously assigned social worker to "an Adoptions Worker, and to provide sufficient time for that worker to complete the assessment."

Shortly before the continued section 366.26 hearing, in an addendum report—a report signed by the *same* social workers as the previous report, rather than an adoptions worker—CFS stated that the child was "doing great in school and in the home," and that grandparents "would like to adopt" the child. Nevertheless, CFS recommended that the court appoint grandparents as the child's legal guardians and issue letters of guardianship, rather than terminating parental rights and proceeding with adoption as the child's permanent plan. CFS's "adoptions unit" had conducted an assessment and determined that grandparents "would not pass an adoption level home study due to the historical concerns presented in the Written Report by the Resource Family Approval unit."[3] The record contains no detail about what, exactly, was meant by "historical concerns." Although the juvenile court inquired, CFS provided no additional detail. We infer, however, and the parties apparently agree, that the only relevant concern about grandparents' home was grandfather's 1991 misdemeanor conviction, which the adoptions unit viewed as disqualifying. The adoptions unit was willing, however, to approve legal guardianship as the "next best permanency option." Grandparents expressed that they would accept guardianship if adoption was not an option.

At a March 1, 2022 hearing, the juvenile court indicated that its inclination, absent CFS's opposition, was to terminate parental rights and select adoption as the child's

---

[3] The February 2022 report characterized the adoption unit's assessment as a "preliminary review of the case." The hearing, however, clarified that there was nothing preliminary about the assessment; the adoption unit did a "full assessment" and simply "d[id] not approve."

permanent plan. It noted, too, that the child's mother and father would give up their rights and "[l]et the grandparents be the parents." The court believed, however, that it lacked authority to terminate parental rights to free the child for adoption by grandparents without an "approved adoption assessment." The court encouraged grandparents "to continue to get whatever assessments they need through whatever agency," stating "I'll gladly—look, I want to grant it." In the meantime, however, the juvenile court followed CFS's recommendation that it order legal guardianship with grandparents as the child's guardians.

## II. DISCUSSION

Grandparents contend that the juvenile court could have and should have terminated parental rights and freed the child for adoption, regardless of CFS's last-minute change of recommendation. CFS disagrees, contending also that grandparents lack standing to challenge the guardianship order. We find grandparents have standing and that they are correct on the merits.

A. *Standing*

CFS argues, citing to authority applicable to de facto parents, that grandparents lack standing to challenge the juvenile court's selection of guardianship over adoption. (E.g., *In re Kieshia E.* (1993) 6 Cal.4th 68, 77-78; *In re Rachael C.* (1991) 235 Cal.App.3d 1445, 1452.) Grandparents here, however, are not just de facto parents.

It is undisputed that the juvenile court was correct to find grandparents and the child share "the sort of 'bonded, quasi-family relationship that courts have found worthy

9

of protection as a fundamental interest.'" (*In re C.P. I*, *supra*, 47 Cal.App.5th at p. 31, quoting *In re H.K.*, *supra*, 217 Cal.App.4th at p. 1435.) CFS has not attempted to reconcile its position that grandparents lack standing with the juvenile court's finding that their relationship with the child merits due process protection as a fundamental interest. In our view, there is no way to do so. An injury to a fundamental interest is a legally cognizable claim. (See *Marbury v. Madison* (1803) 5 U.S. 137, 163 ["'it is a general and indisputable rule, that where there is a legal right, there is also a legal remedy, by suit or action at law, whenever that right is invaded'"], quoting 3 Blackstone, *Commentaries* 23.) That is, an individual's fundamental interest in parenting a particular child confers standing in court to protect that interest against unjustified government interference.

Further, grandparents' fundamental interest in their relationship with the child is injuriously affected by the juvenile court's selection of guardianship over adoption. (See *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1034 ["'Whether one has standing in a particular case generally revolves around the question whether that person has rights that may suffer some injury, actual or threatened'"].) Legal guardianship leaves the child in grandparents' care, to be sure. But it does so on a less permanent basis than adoption, and it requires grandparents to remain in the legal limbo of a "'bonded, quasi-family relationship'" (*In re C.P. I*, *supra*, 47 Cal.App.5th at p. 31), rather than simply being the child's parents. It follows that grandparents are aggrieved by the juvenile court's order and have standing to bring a claim that the decision was erroneous.

10

We are required to "liberally construe the issue of standing and resolve doubts in favor of the right to appeal" (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 948), but there is no need for liberal construction here. Grandparents have standing to challenge the juvenile court's order.

B. *Permanent Plan Order*

Grandparents contend that the juvenile court erred by selecting legal guardianship as the child's permanent plan because, CFS's recommendation to the contrary notwithstanding, no exception to adoption applied. We agree.

At a section 366.26 hearing, the juvenile court selects and implements a permanent plan for a dependent child. (*In re Celine R.* (2003) 31 Cal.4th 45, 52-53.) "In order of preference the choices are: (1) terminate parental rights and order that the child be placed for adoption . . . (2) identify adoption as the permanent placement goal and require efforts to locate an appropriate adoptive family; (3) appoint a legal guardian; or (4) order long-term foster care." (*Id.* at p. 53.) Generally, "[w]henever the court finds 'that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption.'" (*Ibid.*; § 366.26, subd. (c)(1) ["If the court determines . . . that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption"].) Only if one or more of the exceptions enumerated by statute applies may the juvenile court "'choose an option other than the norm, which remains adoption.'" (*In re Caden C.* (2021) 11 Cal.5th 614, 631, quoting *In re Celine R.*, *supra*, 31 Cal.4th at p. 53.)

11

Legal guardianship is an alternative to adoption when a "child is living with a relative who is unable or unwilling to adopt the child because of circumstances that do not include an unwillingness to accept legal or financial responsibility for the child, but who is willing and capable of providing the child with a stable and permanent environment through legal guardianship, and the removal of the child from the custody of their relative would be detrimental to the emotional well-being of the child." (§ 366.26, subd. (c)(1)(A).) CFS reported to the juvenile court that this adoption exception applies. Grandparents are more than willing to adopt the child. The only question is whether there was a legal impediment rendering them "unable" to adopt.

In the juvenile court and in this court, CFS has proposed several related, but analytically separate reasons why it believes grandparents are legally barred from adopting the child. We are not persuaded that any of these reasons are valid.

1. *Child-specific resource family approval*

Grandparents were granted resource family approval under section 16519.5, subdivision (c)(4)(B), allowing them to care for a specific child. CFS attempts to draw a meaningful distinction between the scope of "child-specific" and "full resource family approval." According to its interpretation of the statutes, grandparents' child-specific resource family approval does not make them eligible to adopt the child. Our interpretation differs.

"The resource family approval process is intended to be an expedited assessment of individuals and families to provide foster care and become legal guardians or adoptive

12

families for dependent children.  (§ 16519.5, subd. (a).)  A resource family is 'an individual or family that has successfully met both the home environment assessment standards and the permanency assessment criteria' established by statute and the State Department of Social Services.  (*Id.*, subd. (c)(1); see *id.*, subd. (d).)"  (*In re C.P. I*, *supra*, 47 Cal.App.5th at p. 24.)

Under section 16519.5, subdivision (c)(4)(A), a resource family is "considered eligible to provide foster care for children in out-of-home placement and approved for adoption and guardianship."  Alternatively, "a county may approve a resource family to care for a specific child, as specified in the written directives or regulations adopted pursuant to this section."  (*Id.*, subd. (c)(4)(B)(i).)  Either way, however, approval as a resource family "is in lieu of a foster family home license . . . a certificate of approval issued by a licensed foster family agency . . . relative or nonrelative extended family member approval, *guardianship approval, and the adoption home study approval*."  (*Id.*, subd. (c)(5) (italics added).)  That is, resource family approval substitutes for certain other approvals, whether for a specific child or not.

To be sure, "[a]pproval of a resource family does not guarantee an initial, continued, or adoptive placement of a child," nor does it "guarantee the establishment of a legal guardianship of a child with a resource family."  (§ 16519.5, subd. (c)(6).)  Approval as a resource family does, however, establish that the resource family is *eligible* for placement, including adoptive placement, without any further approvals.  (*Id.*, subd. (c)(5).)

CFS approved grandparents as a resource family. No further adoption home study approval is required. (§ 16519.5, subd. (c)(5).) Although CFS's adoptions unit apparently disagreed with its resource family approval unit's decision, the procedural steps required to rescind resource family approval have not been taken. (See § 16519.5, subd. (f)(8) [requiring State Department of Social Services to implement "due process procedures," including with respect to recissions of approval]; § 16519.6 [hearing procedures].) Moreover, nothing in our record suggests that any appropriate ground for rescinding grandparents' resource family approval exists. (See § 16519.61 [listing grounds to rescind approval].) It follows that grandparents remain approved as a resource family and are eligible to adopt the child.

In support of a different conclusion, CFS proposes that the mention of "adoption" in subdivision (c)(4)(A), and the use of the more general phrase "to care for" in subdivision (c)(4)(B), indicates that child-specific approval is for only a limited purpose, and that "an approval to adopt was meant to be excluded." CFS is placing too much weight on those phrases. Even under CFS's own conclusion, the wording cannot be interpreted in the manner it attempts. CFS argues that legal guardianship is the appropriate alternative to adoption for the child, yet subdivision (c)(4)(B) does not specifically mention adoption *or* guardianship.

Further, although section 16519.5, subdivision (c)(4)(B) was recently amended, its first sentence, authorizing child-specific resource family approval, was added over five years ago, effective January 1, 2018. (2017 Cal. Stats. Ch. 732 § 103 (Assem. Bill No.

404, 2017-2018 Reg. Sess.); 2017 Cal. Stats. Ch. 733 § 4.5 (Sen. Bill No. 213, 2017-2018 Reg. Sess.).) Nevertheless, CFS has not cited, and we have not discovered, any case law since then that might support CFS's interpretation even indirectly.

Moreover, CFS's novel reading of section 16519.5, subdivision (c)(4) is impossible to reconcile with other portions of the statute. (See *Ste. Marie v. Riverside County Regional Park & Open-Space Dist.* (2009) 46 Cal.4th 282, 289 ["We must of course read statutes as a whole so that all parts are harmonized and given effect"].) There is only one definition of "'resource family,'" not one for resource families with "full" approval (CFS's phrasing, which does not appear in the statute) and another for those granted child-specific approval. Rather, the statute defines "'resource family approval'" to "mean an individual or family that has successfully met . . . *the permanency assessment criteria* adopted pursuant to subdivision (d) . . . ." (§ 16519.5, subd. (c)(1) (italics added.) If CFS's interpretation were correct, at a minimum there would be two tiers of permanency assessment criteria, only one of which would consider whether the applicant is able to provide permanence though adoption, since those seeking child-specific approval would not be eligible to adopt. But there is nothing of the sort. (See *id.*, subd. (d).)

It appears to us that the Legislature authorized child-specific resource family approval for a reason that has nothing to do with creating a more-limited scope of approval for those approved for a specific child. The authorization resolved a tension that existed in the prior version of the statute. Similar to the current section 16519.5,

15

subdivision (c)(4)(A), former section 16519.5, subdivision (c)(4) provided broadly that "a resource family shall be considered eligible to provide foster care for related and unrelated children in out-of-home placement and shall be considered approved for adoption or legal guardianship." (Former § 16519.5, subd. (c)(4), eff. Jun. 27, 2017-Dec. 31, 2017.) At the same time, however, the statute mandated (as it still does) that a "relative or nonrelative extended family member's expressed desire to only care for a specific child or children shall not be a reason to deny the approval." (Former § 16519.5, subd. (d)(3)(B)(i); see current § 16519.5, subd. (d)(3)(B)(i) [same].) Before 2018, then, an applicant might receive broad formal approval to provide foster care for any dependent child, as well as approval for adoption or legal guardianship, even though the applicant was willing or able to care only for one specific child. Child-specific approval resolves that incongruity.

The legislative history includes little discussion of the 2018 addition of section 16519.5, subdivision (c)(4)(B), and corresponding edits to subdivision (c)(4)(A). What there is, however, tends to support our interpretation that the statute allows the approving agency the option of approving a resource family with all the rights and responsibilities that entails, but limited to a specific child. (Assem. Floor Analysis of Assem. Bill 404 (2017-2018 Reg. Sess.) Sept. 13, 2017, p. 1 [the bill "[a]uthorizes an FFA or a county to approve a resource family to care for a specific child, as specified"].) So interpreted, child-specific approval furthers the legislative intent, already expressed in even earlier versions of the resource family statutes, that "*all children* live with a committed,

16

*permanent*, and nurturing family and that services and supports should be *tailored to meet the needs of the individual child and family being served . . . .*" (*Id.*, at p. 4 (italics added).)  Nothing in the legislative history suggests intent of the sort CFS has proposed, to create a limited form of resource family approval that does not include approval to adopt.

We conclude that grandparents' approval as a resource family for the child means that they are eligible to adopt the child.  CFS and the juvenile court erred in concluding otherwise.

2. *Adoptive Home Study*

CFS proposes that for grandparents to adopt the child, on top of resource family approval, they also would have to obtain an "approved adoptive home study" under Family Code section 8730.  However, a Family Code home study is *not* a prerequisite to adoption for a resource family.  On the contrary, as discussed above, approval as a resource family "is in lieu of . . . the adoption home study approval" (§ 16519.5, subd. (c)(5)), and a resource family "shall be considered . . . approved for adoption . . . ." (*id.*, subd. (c)(4)(A).)  This makes sense, as the comprehensive resource family approval process exists to "replace the existing multiple processes" for, among other things, "approving . . . adoptive families." (§ 16519.5, subd. (a).)

At oral argument, in arguing for a different conclusion, CFS emphasized references to previously existing processes for approving foster families or adoptive families that remain in the law.  (See, e.g., § 366.26, subd. (n)(2) [listing some factors

17

court may consider in designating current caretaker as prospective adoptive parent]; Fam. Code, §§ 8704.5 [placement of child by licensed private adoption agency], 8710 [placement criteria for adoptive placement with relatives where child has *not* been adjudged a dependent], 8730 [abbreviated home study assessments], 8732 [report of medical examination of foster parent or relative caregiver].) This line of reasoning ignores that the resource family approval process was implemented gradually. (See Health & Saf. Code § 1517, subd. (f).) Thus, older approval processes continue to exist in parallel, and may still be relevant in some cases. They are not relevant in this case, since grandparents were approved as a resource family.

Where, as here, a child's prospective adoptive parents have been approved as a resource family—whether the approval was child-specific or not—no additional adoption home study, abbreviated or otherwise, is required; they are simply "approved for adoption." (*Id.*, subd. (c)(4)(A).) Again, CFS and the juvenile court erred in concluding otherwise.

3. *Disqualifying Offense*

CFS asserts that grandfather's criminal history is "disqualifying" because "Family Code section 8712 specifically prohibits [CFS] from approving the home for adoption." Not so.

Family Code section 8712, subdivision (c), provides as follows: "The department, county adoption agency, or licensed adoption agency shall not give final approval for an adoptive placement in any home in which the prospective adoptive parent or any adult

18

living in the prospective adoptive home has been convicted of an offense for which an exemption cannot be granted pursuant to subparagraph (A) of paragraph (2) of subdivision (g) of Section 1522 of the Health and Safety Code." When this matter was previously on appeal, grandfather's offense was listed in Health and Safety Code section 1522, subdivision (g)(2)(A) as an offense for which an exemption cannot be granted. (*In re C.P. I.*, *supra*, 47 Cal.App.5th at p. 22; former § 1522, subd. (g)(2)(A)(i).)

We held, however, that "due process would require an individualized determination," rather than application of the absolute statutory bar to granting a criminal history exemption, "if it is determined that grandparents have a *parental* relationship with the child." (*In re C.P. I*, *supra*, 47 Cal.App.5th at p. 31.) Grandparents were then determined to have such a relationship with the child. Thus, section 1522 "may not, consistent with the California State and United States Constitutions, absolutely disqualify" them from receiving an exemption for grandfather's decades-old misdemeanor conviction. (*In re C.P. I*, at p. 29.) And indeed CFS granted grandfather an exemption and approved grandparents as a resource family.[4] Thus, again, no additional

_____

[4] The juvenile court's instruction that CFS disregard grandfather's conviction in reassessing grandparents' application for resource family approval was not consistent with our direction that, even where due process principles require an individualized assessment rather than application of an absolute statutory bar, the Legislature's judgment that a conviction is disqualifying nevertheless should be the "starting point in the analysis." (*In re C.P. I*, *supra*, 47 Cal.App.5th at p. 30.) CFS did not object to the juvenile court's instruction, however, and in any case the issue was mooted by the subsequent changes in the law relating to grandfather's conviction offense, discussed below.

approval for adoption under the Family Code is required; grandparents simply are "approved for adoption." (§ 16519.5, subd. (c)(4)(A).)

Moreover, after *In re C.P. I*, the Legislature codified our holding, and also expanded upon it, by adopting Senate Bill 354. Among other things, Senate Bill 354 modified Health and Safety Code section 1522 in several respects. Previously, any conviction, no matter how long ago, for certain enumerated offenses including grandfather's conviction offense, was "categorically nonexemptible." (*In re C.P. I*, *supra*, 47 Cal.App.5th at p. 25; see former Health & Saf. Code, § 1522, subd. (g)(2)(A)(i)-(iii) [listing offenses]; § 16519.5 [requiring denial of home approval for those convicted of offenses described in Health & Saf. Code, § 1522, subd. (g)(2)(A)].) After Senate Bill 354, a conviction for the enumerated offenses "*within the past 10 years*" is *generally*, but with a new, limited exception, nonexemptible, as are convictions for certain felonies of any vintage. (Health & Saf. Code, § 1522, subds. (g)(2)(A), (g)(2)(A)(i)-(iii) (italics added).). Thus, under current law, grandfather's conviction, which is *more* than ten years old and a misdemeanor, is not generally nonexemptible (*id.*, subd. (g)(2)(A)(i)-(iii)), nor even exemptible in the discretion of the agency (*id.*, subd. (g)(2)(B) [describing offenses for which the agency "may grant an exemption from disqualification"].) Rather, it is now an offense for which CFS is, given grandfather's otherwise clean record, statutorily *required* to grant an exemption: "The department or other approving entity *shall grant* an exemption from disqualification to a . . . resource family applicant . . . who has been convicted of an offense not listed in subparagraph (A)

20

or (B), if the individual's state and federal criminal history information received from the Department of Justice independently supports a reasonable belief that the applicant . . . is of present good character necessary to justify the granting of an exemption." (*Id.*, subd. (g)(2)(D) (italics added).) In light of this new law, we cannot see a basis for CFS's persistence in arguing that grandfather's conviction offense disqualifies him from adopting the child.

Senate Bill 354 also created a new exception even for offenses that remain generally nonexemptible under Health and Safety Code section 1522, subdivision (g)(2)(A): for the "sole purpose" of child-specific approval under section 16519.5, subd. (c)(4)(B), an exemption may be granted to an applicant who would otherwise be disqualified, but who (1) is "seeking placement of a specific child or children with whom the applicant is related" (2) "is of present good character necessary to justify granting the exemption" by certain listed factors, and (3) does not have a felony conviction for specified crimes within the last five years. (Health & Saf. Code, § 1522, subd. (g)(2)(A)(iv); see *id.*, subd. (g)(2)(C) [listing factors to weigh in considering exemption].) Section 16519.5, subdivision (c)(4)(B)(i) was also modified to specify that "[c]hild-specific approval shall be considered if the applicant is a relative . . . who has an established and significant relationship with a child . . . ." Nevertheless, this new exception, modeled on our holding in *In re C.P. I*, need not even be invoked by grandfather, whose conviction is no longer among those to which Health and Safety Code, section 1522, subdivision (g)(2)(A) applies.

21

We conclude that CFS has not established that grandfather's decades-old misdemeanor conviction disqualifies him from adopting the child. On the contrary, *In re C.P. I* and the changes to the law enacted by Senate Bill 354, combined with grandfather's subsequent lack of any other criminal history, compel the conclusion that CFS was required to grant grandfather an exemption. And grandparents' approval as a resource family means that they are eligible to adopt the child.

C. *Remedy*

Having determined that nothing in the record supports the juvenile court's conclusion that an exception to adoption applied, we must consider the appropriate remedy. Grandparents ask that we not only reverse that erroneous finding, but also direct the juvenile court to (1) order adoption as the child's permanent plan, (2) find the child adoptable, (3) issue orders terminating parental rights, and (4) designate grandparents as the child's prospective adoptive parents. Particularly given that grandparents have persuaded us that the juvenile court should have made such orders at the March 2022 section 366.26 hearing, such a disposition has appeal.

Nevertheless, we are concerned that the appellate process is slow and life can sometimes move fast. By the time this opinion issues, more than a year will have elapsed since the section 366.26 hearing. Conceivably, much could have changed in that time, whether because of grandparents' actions or events out of their control.

Grandparents cite *In re D.R.* (2016) 6 Cal.App.5th 885 as a case where, upon reversing a juvenile court's order of legal guardianship based on an erroneous finding

that an exception to adoption applied, the court of appeal directed the juvenile court "to enter a new order of adoption as D.R.'s permanent plan." (*Id.* at p. 893.) D.R., however, was apparently both generally and specifically adoptable and there seems to have been no reason to contemplate any other outcome. (*Id.* at p. 891 [stating that "it is undisputed that D.R. was adoptable"]; see *In re Valerie W.* (2008)162 Cal.App.4th,1, 13 ["If the child is considered generally adoptable, we do not examine the suitability of the prospective adoptive home"].) Here, in contrast, if adoption by grandparents were to fall through due to changed circumstances, it is conceivable it would be difficult to find new prospective adoptive parents for the child. (See *In re C.P. I*, *supra*, 47 Cal.App.5th at p. 21 [noting the child's "special heath care needs related to autism"]; *In re Valerie W.*, *supra*, 162 Cal.App.4th at p. 14 [agency required to assess capability of prospective adoptive parent to meet the child's needs].)

We thus do not want to direct the outcome as grandparents suggest, and we find it appropriate for the juvenile court to reconsider its ruling at the section 366.26 hearing, taking into account any recent changes in circumstances as well as the views we have expressed here, rather than directing a result.

## III. DISPOSITION

The juvenile court's order of legal guardianship is reversed. The juvenile court is directed to conduct a new section 366.26 hearing and to make further orders as appropriate, consistent with this opinion. Such orders should include a finding that, unless and until grandparents' resource family approval is rescinded, no adoption home

23

study or further approval of appellants as adoptive parents is required.  The juvenile court shall nevertheless order any assessments routinely required in connection with the setting of a section 366.26 hearing.  To expedite further proceedings in the juvenile court, our remittitur shall issue forthwith.

CERTIFIED FOR PUBLICATION

RAPHAEL             
           J.

We concur:

CODRINGTON         
      Acting P. J.

SLOUGH            
      J.